**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MAZON: A JEWISH RESPONSE TO HUNGER;
SERVICES & ADVOCACY FOR GLBT
ELDERS; THE NEW YORK CITY GAY AND
LESBIAN ANTI-VIOLENCE PROJECT; ARK
OF FREEDOM ALLIANCE; FREEDOM FROM
RELIGION FOUNDATION; AMERICAN
ATHEISTS; and HINDU AMERICAN
FOUNDATION,

       *Plaintiffs*,

    vs.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; SECRETARY OF
HEALTH AND HUMAN SERVICES, currently
Alex M. Azar; U.S. DEPARTMENT OF
AGRICULTURE; SECRETARY OF
AGRICULTURE, currently Sonny Perdue; U.S.
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT; SECRETARY OF HOUSING
AND URBAN DEVELOPMENT, currently Dr.
Ben Carson; U.S. DEPARTMENT OF
VETERANS AFFAIRS; SECRETARY OF
VETERANS AFFAIRS, currently Robert Wilkie;
U.S. DEPARTMENT OF EDUCATION;
SECRETARY OF EDUCATION, currently
identified as Dr. Mitchell Zais in an acting capacity,
U.S. DEPARTMENT OF HOMELAND
SECURITY; SECRETARY OF HOMELAND
SECURITY, currently identified as Peter T. Gaynor
in an acting capacity; U.S. DEPARTMENT OF
JUSTICE; U.S. ATTORNEY GENERAL,
currently identified as Jeffrey A. Rosen in an acting
capacity; U.S. DEPARTMENT OF LABOR; and
SECRETARY OF LABOR, currently Eugene
Scalia,

       *Defendants.*

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

1.      Plaintiffs, MAZON: A Jewish Response to Hunger, Services & Advocacy for

GLBT Elders, The New York City Gay and Lesbian Anti-Violence Project, Ark of Freedom

Alliance, Freedom From Religion Foundation, American Atheists, and the Hindu American

Foundation, hereby bring this case under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et

seq*., ("APA"), against Defendants, the U.S. Department of Health and Human Services

("HHS"), the U.S. Department of Agriculture ("USDA"), the U.S. Department of Housing and

Urban Development ("HUD"), the U.S. Department of Veterans Affairs ("VA"), the U.S.

Department of Education ("ED"), the U.S. Department of Homeland Security ("DHS"), the U.S.

Department of Justice ("DOJ"), and the U.S. Department of Labor ("DOL") and their respective

Secretaries (the Attorney General for DOJ) in their official capacities (collectively, the

"Agencies"), challenging the recently promulgated joint final rule Equal Participation of Faith-

Based Organizations in the Federal Agencies' Programs and Activities, 85 Fed. Reg. 82,037

(Dec. 17, 2020) ("the 2020 Rule").

2.      The 2020 Rule amends the regulations of nine federal agencies, eight named here

as Defendants, and in so doing reverses consensus-based policies developed by all those

agencies over several years and finalized in a 2016 rulemaking ("the 2016 Rule"). The 2016

Rule set forth a framework for balancing the interests implicated when federal funding is used

to provide essential social services through faith-based providers.

3.      The 2020 Rule eliminates the common-sense and agreed-upon requirements from

the 2016 Rule, such as that beneficiaries receiving services from a faith-based provider receive a

notice of their rights not to be discriminated against based on religion and the option to request

a referral to an alternate provider. These requirements imposed virtually no burden, but

provided beneficiaries with much-needed information empowering them to protect their own religious liberty.

4.     A hungry person receiving a food box from a church would have no reason to know that box is supported with federal tax dollars. Nor would they know that the use of federal funds confers important protections—the hungry person need not join in a prayer, for example, nor must that person say grace prior to eating a federally funded congregate meal. A transgender homeless teen would have no reason to know that a federally funded shelter associated with a religion that condemns LGBTQ people is not allowed to require that young person to attend religious programming. A Bhutanese Hindu refugee is unlikely to know that they can turn down an invitation to join in bible study, but still receive job training services from a faith-based provider. An older person would not necessarily know that a faith-based long-term care provider receiving federal funds cannot require any sort of religious participation.

5.     Providing this basic information is essential to empowering people, especially the vulnerable people most in need of federally funded social services, to protect themselves from unwanted proselytization and discrimination as they seek assistance for their basic needs. And the option to be referred to an alternate provider is an important safeguard that ensures that no one receiving taxpayer-funded services is forced to obtain them from a religious provider to which that person objects.

6.     These common-sense requirements were the successful result of a historic effort to reach consensus among many different views on how religion and government should interact in the context of federally funded social services. As the Advisory Council on Faith-Based and Neighborhood Partnerships, which unanimously recommended the protections adopted in the 2016 Rule, said at the time:

> It is rare, if not unprecedented, for a governmental body to ask such a diverse group to seek common ground on a wide range of issues through sustained dialogue and deliberation. This process has been an education for Council members and, if we may say so, a blessing. Our report is the fruit of that labor. . . . At a time when our political discourse is often dysfunctional because of bitter division and distrust, endeavors like these are absolutely essential. Governmental leaders and citizens alike should take action now to improve the conversation about our shared future, to protect the most vulnerable among us, and to form a more perfect union.[1]

7.     But after only a few years, the Trump Administration abandoned that consensus, imposing instead a regulatory scheme that considers *only* the interests of faith-based providers, not the religious liberty of beneficiaries, and thereby ignores the most vulnerable among us.

8.     As many commenters explained, and as the Plaintiffs can attest, this change will harm the religious freedom of beneficiaries and reduce access to essential social services. A Jew, Hindu, or person of another minority faith or a nonreligious person might forgo desperately needed services if that person's initial contact with a provider is in a church adorned with Christian iconography and they do not receive a notice assuring them that they need not participate in church services. An LGBTQ adult trying to escape intimate partner violence may not receive needed counseling if their first attempt is with an organization with a religious view that it is a sin to leave one's spouse or that it is a sin to be in a same-sex relationship, and the survivor is not made aware that a referral may be available. LGBTQ teens have chosen to sleep on the streets, or for a nonbinary client of one plaintiff, in a dumpster, instead of in a shelter seen as condemning them. And older people may endure unwanted religious coercion to receive vital services in their daily lives.

---

[1] President's Advisory Council on Faith-based and Neighborhood Partnerships, *A New Era of Partnerships: Report of Recommendations to the President* ix (March 2010) ("Advisory Council Report"), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ofbnp-council-final-report.pdf.

9.      At a time when our country is reeling from a historic pandemic and an associated economic crisis, the federal government should be making it easier for people to obtain food, shelter, job training, and the many other federally funded social services, not raising barriers.

10.      Because the Agencies provide no reasonable justification for the rule change, because they fail to account for the harms caused by the 2020 Rule, because their reasoning is inconsistent and contrary to the record, and because they fail to consider obvious alternatives, the 2020 Rule is arbitrary and capricious in violation of the APA. Plaintiffs respectfully ask that it be set aside.

## Parties

11.      **MAZON: A Jewish Response to Hunger ("MAZON")** is a national advocacy organization inspired by Jewish values and ideals that works to end hunger among people of all faiths and backgrounds in the United States and Israel. It is a nonprofit organization headquartered in Los Angeles, California.

12.      **Services & Advocacy for GLBT Elders ("SAGE")** is a national advocacy and services organization whose mission is to allow LGBTQ older people to age with respect and dignity. SAGE is a nonprofit organization headquartered at 305 Seventh Avenue, New York, NY 10001.

13.      **The New York City Gay and Lesbian Anti-Violence Project (the "NYC Anti-Violence Project" or "AVP")** provides a range of direct services, educational programs, trainings, and policy advocacy in pursuit of its mission to help build a world in which all LGBTQ and HIV-affected people are safe, respected, and free from violence. It is a nonprofit organization headquartered at 116 Nassau St #3, New York, NY 10038.

14.     **Ark of Freedom Alliance ("AFA")** works to end the sex and labor trafficking of children and young adults and to empower male and LGBTQ survivors, as well as youth at risk, by providing a variety of services and economic support to those young people. It is a nonprofit organization headquartered in Fort Lauderdale, Florida.

15.     **Freedom from Religion Foundation ("FFRF")** is a national educational organization whose purpose is to promote the constitutional principle of separation of state and church, and to educate the public on matters relating to nontheism. It is a nonprofit organization headquartered in Madison, Wisconsin.

16.     **American Atheists ("AA")** is a national educational and civil rights organization dedicated to protecting the civil rights of atheists and nonreligious people, supporting the separation of religion and government, and promoting understanding of atheists through education, outreach, and community-building. It is a nonprofit organization headquartered in Cranford, New Jersey.

17.     **Hindu American Foundation ("HAF")** is an educational and advocacy organization for the Hindu American community. HAF focuses on the areas of education, policy, and community building, and works on a range of issues, including fostering an accurate understanding of Hinduism, advancing civil and human rights, and addressing contemporary problems by applying Hindu philosophy. HAF is a nonprofit organization headquartered in Washington, DC.

18.     **The U.S. Department of Health and Human Services** is a federal agency. It joined in promulgating the final rule at issue in this litigation: Equal Participation of Faith-Based Organizations in the Federal Agencies' Programs and Activities, which amends its regulations at 45 C.F.R. Parts 87 and 1050.

19.     **The Secretary of Health and Human Services** is sued in their official capacity. The position is currently held by Alex M. Azar II.

20.     **The U.S. Department of Agriculture** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 7 C.F.R. Part 16.

21.     **The Secretary of Agriculture** is sued in their official capacity. The position is currently held by Sonny Perdue.

22.     **The U.S. Department of Housing and Urban Development** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 24 C.F.R. Parts 5, 92, and 578.

23.     **The Secretary of Housing and Urban Development** is sued in their official capacity. The position is currently held by Dr. Ben Carson.

24.     **The U.S. Department of Veterans Affairs** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 38 C.F.R. Parts 50, 61, and 62.

25.     **The Secretary of Veterans Affairs** is sued in their official capacity. The position is currently held by Robert Wilkie**.**

26.     **The U.S. Department of Education** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 2 C.F.R. Part 3474 and 34 C.F.R. Parts 75 and 76.

27.     **The Secretary of Education** is sued in their official capacity. The position is currently identified as being held by Dr. Mitchell Zais in an acting capacity.

28.     **The U.S. Department of Homeland Security** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 6 C.F.R. Part 19.

29.     **The Secretary of Homeland Security** is sued in their official capacity. The position is currently identified as being held by Peter J. Gaynor in an acting capacity.

30.     **The U.S. Department of Justice** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 28 C.F.R. Part 38.

31.     **The U.S. Attorney General** is sued in their official capacity. The position is currently identified as being held by Jeffrey A. Rosen in an acting capacity.

32.     **The U.S. Department of Labor** is a federal agency. It joined in promulgating the final rule at issue in this litigation, which amends its regulations at 29 C.F.R. Part 2.

33.     **The Secretary of Labor** is sued in their official capacity. The position currently is held by Eugene Scalia.

## Jurisdiction and Venue

34.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, namely the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.

35.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), because Plaintiffs SAGE and AVP are headquartered in this district.

## Background

## I.     The Consensus-Based Process that Led to the 2016 Rule

36.     In 2009, President Obama appointed a diverse group of leaders to serve as members of an Advisory Council on Faith-based and Neighborhood Partnerships. He charged the

Council with making recommendations on how to improve partnerships with religiously affiliated and neighborhood organizations to serve people in need.[2]

37.     The Council was asked to identify best practices and successful modes of delivering social services, to evaluate the need for improvements in implementing and coordinating public policies relating to faith-based and other neighborhood organizations, and to make recommendations for changes to improve the delivery of services by such organizations and to better serve the needs of low-income and other underserved persons.[3]

38.     The Council established six task forces, including, as relevant here, the Reform of the Office of Faith-based and Neighborhood Partnerships Task Force.[4]

39.     The Task Force was asked "to make recommendations for improving the operations of the White House Office of Faith-based and Neighborhood Partnerships and Agency Centers and for strengthening the social service partnerships the [g]overnment forms with nongovernmental providers, including strengthening the constitutional and legal footing of these partnerships."[5] It did so, and its twelve recommendations were ultimately considered, modified, and adopted by the Council.[6]

40.     The Task Force members were as diverse as the Council as a whole, representing a wide range of perspectives on church-state issues. They included, for example, representatives from the Union of Orthodox Jewish Congregations of America, the Human Rights Campaign

---

[2] *See About the President's Advisory Council on Faith-based and Neighborhood Partnerships*, Obama White House Archives, https://obamawhitehouse.archives.gov/administration/eop/ofbnp/about/council (last visited Jan. 11, 2021).

[3] *See id.*

[4] Advisory Council Report at 117.

[5] *Id*. at 119.

[6] *Id.* at viii (describing Advisory Council review of Task Force recommendations).

Foundation, the Baptist Joint Committee on Religious Liberty, the U.S. Conference of Catholic

Bishops, and Americans United for Separation of Church and State.[7]

41.     As the Council described its decision to adopt the twelve recommendations in its

March 2010 Final Report:

> The Council's diversity has been an asset in the development of these
> recommendations. . . . As the recommendations note, Council members continue to
> differ over . . . important issues. But members have come to an agreement on 12
> recommendations presented here. As far as we know, this is the first time a
> governmental entity has convened individuals with serious differences on some
> church-state issues and asked them to seek common ground in this area. It should
> not be the last time a government body does so. Policies that enjoy broad support
> are more durable. And finding common ground on church-state issues frees up
> more time and energy to focus on the needs of people who are struggling.
>
> If adopted, these recommendations would improve social services delivery and
> strengthen religious liberty. They also would reduce litigation, enhance public
> understanding of these partnerships, and otherwise advance the common good.
> Accordingly, the Council urges the Administration to implement these proposals.[8]

42.     The recommendations reflected the Council's agreement that strengthening

protections for the religious liberty of beneficiaries of federally funded social service programs

was an important goal.[9]

43.     For example, the Council recommended that agency communications and

agreements with organizations receiving federal funding for social welfare services continue to

clearly prohibit discrimination against beneficiaries or potential beneficiaries on the basis of

religion or religious belief.[10]

---

[7] Advisory Council Report at 117.

[8] *Id.* at 120.

[9] *Id.* at 140 ("Recommendation 10: Assure the religious liberty rights of the clients and
beneficiaries of federally funded programs by strengthening appropriate protections.").
[10] *Id.* at 140.

44.     The Council also recommended additional steps "to bolster the protections of beneficiaries' rights," including adopting and modifying certain protections required by statutes and regulations governing programming of the Substance Abuse and Mental Health Services Administration ("SAMHSA"). These protections require that program providers give beneficiaries notice of their rights in writing at the time the beneficiary entered or joined the program and that a beneficiary who requests an alternative service provider, due to that beneficiary's objection to the religious character of the initial service provider, receive a referral to another provider.[11]

45.     As the Council explained regarding these notice and referral requirements:

> One cannot assume that those who are seeking aid through the array of federally funded social welfare programs would be aware of their religious liberty rights. Thus, a notice requirement of those rights to program beneficiaries is essential and should be provided at the outset of the person's participation in the federally funded program. But notice alone may be insufficient to protect the rights of an eligible beneficiary without the actual availability of an alternate means of receiving the service delivery.[12]

46.     The Council also recommended that the administration clarify the distinction between direct federal financial assistance and indirect aid, such as federal funding provided through a voucher program. As it noted, the Supreme Court had treated the two differently for the purpose of Establishment Clause analysis.[13]

47.     The Council further recommended protections for faith-based organizations seeking federal funding to provide social services, including that religious affiliation should not be a factor in the grant-making process.[14]

---

[11] *Id.* at 140-41.

[12] *Id.* at 141.

[13] *Id.* at 133-34.

[14] *Id.* at 128.

48.     On November 17, 2010, President Obama signed Executive Order 13559, which adopted many of the Council's recommendations, including those discussed above.[15] This directive amended Executive Order 13279, signed by President George W. Bush in December 2002.[16]

49.     Executive Order 13559 retained protections from section 2(d) of Executive Order 13279, prohibiting all organizations receiving federal financial assistance from discriminating against beneficiaries on the basis of religion, religious belief, refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.[17]

50.     Section 2(h) of Executive Order 13559 directed that agencies using federal financial assistance for social service programs require beneficiary protections recommended by the Council—prohibiting discrimination against beneficiaries on the basis of religion or religious belief, including a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice; mandating a written notice of rights; and mandating a referral to another provider if the beneficiary objects to the religious character of the original provider.

51.     Executive Order 13559 also required that organizations engaging in explicitly religious activities must separate these activities in time or location from programs supported with direct federal financial assistance; that such activities cannot be subsidized with direct federal financial assistance; and that participation in those activities must be voluntary for the

---

[15] Fundamental Principles and Policymaking Criteria for Partnerships with Faith-Based and Other Neighborhood Organizations, 75 Fed. Reg. 71,319 ("EO 13559").

[16] Equal Protection of the Laws for Faith-Based and Community Organizations, 67 Fed. Reg. 77,141 ("EO 13279").

[17] EO 13559 prohibited discrimination based on the "refusal to attend or participate in a religious practice," while EO 13279 prohibited discrimination based on "refusal to actively participate in a religious practice." EO 13559 § 2(d); EO 13279 § 2(d).

beneficiaries of the social service program supported with federal financial assistance. EO 13559 §§ (f), (g).

52.  Executive Order 13559 also provided guidelines for ensuring that "all eligible organizations, including faith-based and other neighborhood organizations, are able to compete on an equal footing for Federal financial assistance used to support social service programs." EO 13559 § 2(b). It emphasized that faith-based providers are eligible to compete for federal social service program funding and to participate in those programs while maintaining their religious identity. *Id*. § (2)(g). It prohibited award decisions from being made on the basis of religious affiliation. *Id*. § (2)(j).

53.  Thereafter, and pursuant to that Executive Order, the Office of Management and Budget issued guidance requiring that certain agencies amend their regulations and guidance documents to be consistent with the fundamental principles stated in Executive Order 13559. [18]

54.  Nine agencies, including Defendants HHS, HUD, USDA, VA, ED, DHS, DOJ, and DOL, published proposed regulations consistent with this OMB guidance in 2015.

55.  The agencies published a joint final rule on April 4, 2016: the 2016 Rule. [19]

## II.  **Requirements of the 2016 Rule**

56.  With limited exceptions (not applicable here), the 2016 Rule uniformly required the following of the various agencies' federal financial assistance programs:

---

[18] Office of Mgmt. & Budget, M-13-19, Implementation of Executive Order 13559, "Fundamental Principles and Policymaking Criteria for Partnerships With Faith-Based and Other Neighborhood Organizations" (Aug. 2, 2013), at 2, available at https://obamawhitehouse.archives.gov/sites/default/files/omb/memoranda/2013/m-13-19.pdf.

[19] Federal Agency Final Regulations Implementing Executive Order 13559: Fundamental Principles and Policymaking Criteria for Partnerships With Faith-Based and Other Neighborhood Organizations, 81 Fed. Reg. 19,355-01.

57.     **Discrimination prohibition:** "[A]ll organizations that receive Federal financial assistance are prohibited from discriminating against beneficiaries in the provision of program services based on religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice."[20]

58.     **Notice requirements:** "[F]aith-based organizations that receive direct Federal financial assistance under a domestic social service program [must] provide written notice of certain protections to beneficiaries of the program," including that:

- The organization may not discriminate against a beneficiary based on religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice;

- The organization may not require a beneficiary to attend or participate in any explicitly religious activities that are offered by the organization, and any participation by the beneficiaries in those activities must be purely voluntary;

- The organization must separate in time or location any privately funded explicitly religious activities from activities supported by direct federal financial assistance;

- If a beneficiary or prospective beneficiary objects to the religious character of the organization, the organization will undertake reasonable efforts to identify and refer the beneficiary to an alternative provider to which the beneficiary does not object; and

---

[20] 81 Fed. Reg. at 19,358.

- A beneficiary or prospective beneficiary may report violations of these protections, including any denials of services or benefits, to the Federal agency or intermediary administering the program.[21]

59.     The Agencies collectively explained that providing such notices "does not place an undue burden on recipients of direct federal financial assistance, particularly when balanced against the notice's benefit—informing beneficiaries of valuable protections of their religious liberty."[22]

60.     **Alternate provider referral requirement:** Faith-based recipients of direct federal financial assistance must "undertake reasonable efforts to identify an alternative provider, if a beneficiary or prospective beneficiary objects to the religious character of the faith-based organization, and to refer the beneficiary to an identified alternative provider."[23]

61.     As the Agencies collectively explained, despite any burden imposed by this requirement, they believed "that the organizations required to make the referrals will generally be in the best position to identify alternative providers in reasonable geographic proximity and to make a successful referral of objecting beneficiaries to those alternative providers."[24]

62.     Because the alternative provider requirement is triggered by a beneficiary's objections to an organization's "religious character," only faith-based or religious organizations were required to provide notice of these protections. The agencies emphasized that such organizations only had to make "reasonable efforts" to identify an alternative provider to which the beneficiary did not object and refer the beneficiary to that provider. The 2016 Rule clarified

---

[21] *Id.*
[22] *Id.* at 19,365.
[23] *Id.* at 19,358.
[24] *Id.* at 19,366.

that this meant no more than two hours of staff time, although the agencies anticipated it would typically be much less. If the organization was "unable" to identify an alternative provider, it simply had to notify the awarding entity, which would then "determine whether there is a suitable alternative provider to which the beneficiary can be referred."[25]

63.     **Clarification of prohibited religious activities:** The 2016 Rule prohibits the use of direct federal financial assistance for "explicitly religious activities," replacing the term "inherently religious activities" in some regulations and adding the prohibition in others. The agencies explained that doing so "provides greater clarity about the separation of activities funded by direct federal financial assistance."[26]

64.     **Distinction between direct and indirect federal financial assistance:** The 2016 Rule explained that its nondiscrimination requirements applied to both direct and indirect federal financial assistance, but "[a]t the same time, the final regulations provide that an organization that participates in a program funded by indirect financial assistance need not modify its program activities to accommodate a beneficiary who chooses to expend the indirect aid on the organization's program." So, while an organization would not have to omit religious components of its program to receive indirect federal financial assistance, it could not discriminate against a beneficiary who chose not to participate in those components. The 2016 Rule also incorporated the framework set out by the Supreme Court in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), which concluded that a state school voucher program did not violate the Establishment Clause because it involved "'true private choice,' was neutral toward religion, and offered beneficiaries

---

[25] *Id.*
[26] *Id.* at 19,372.

adequate secular options." The definition of indirect federal financial assistance included those criteria.[27]

65.     **Protections for provider organizations receiving federal financial assistance:** The 2016 Rule requires that faith-based organizations be eligible to participate in the Agencies' social service programs on the same basis as any other private organization; and that all decisions about federal financial assistance must be free from political interference, or even the appearance of such interference, and be based on merit, not based on the organization's religious affiliation or lack thereof.[28]

66.     The 2016 Rule became effective on May 4, 2016.[29]

## III.   The 2020 Rule's Abandonment of These Consensus Policies

67.     One year later, President Trump issued Executive Order 13798, Promoting Free Speech and Religious Liberty, which states, "Federal law protects the freedom of Americans and their organizations to exercise religion and participate fully in civic life without undue interference by the Federal Government. The executive branch will honor and enforce those protections." It directed the Attorney General to "issue guidance interpreting religious liberty protections in Federal law."[30]

68.     Thereafter, the Attorney General issued a Memorandum on Religious Liberty. This Memorandum asserted that "[g]overnment may not exclude religious organizations as such from secular aid programs . . . when the aid is not being used for explicitly religious activities

---

[27] *Id.* at 19,361-62.
[28] *Id.* at 19,358.
[29] *Id*. at 19,355.
[30] 82 Fed. Reg. 21,675 (May 4, 2017).

such as worship or proselytization."[31] It set forth the Attorney General's analysis of the

Religious Freedom Restoration Act (RFRA), and various guidance to agencies.

69.     Based in part on the analysis in the Attorney General's Memorandum, President

Trump issued a second Executive Order the following year, Executive Order 13831,

Establishment of a White House Faith and Opportunity Initiative.[32] This Executive Order

revoked section 2(h) of President Obama's amended Executive Order 13279—the section

requiring alternative provider referral and notice of rights for beneficiaries of federally funded

social service programs. EO 13831 § 2(b).

70.     Following these two Executive Orders and the Attorney General's Memorandum,

in January 2020, the nine Agencies proposed the rules at issue in this litigation. These new rules

eliminate many of the consensus-based beneficiary protections of the 2016 Rule, while

reinforcing provider protections. The Agencies finalized these changes in a joint final rule

published in the Federal Register on December 17, 2020, with an effective date of January 19,

2021 (the "2020 Rule").[33]

71.     The primary purpose of the 2020 Rule, as explained by the Agencies, is to

"protect the religious liberty of faith-based organizations" providing services funded by federal

financial assistance,[34] not to protect either the religious liberty or the ability to access services of

beneficiaries. Accordingly, the 2020 Rule generally reduces protections for beneficiaries while

reinforcing and expanding protections for faith-based service providers.

---

[31] *See* Federal Law Protections for Religious Liberty, 82 Fed. Reg. 49,668, 49,699 (Oct. 26, 2017).

[32] 83 Fed. Reg. 20,715 (May 3, 2018) ("EO 13831").

[33] Equal Participation of Faith-Based Organizations in the Federal Agencies' Programs and Activities. 85 Fed. Reg. 82,037.

[34] *See*, *e.g.*, 85 Fed. Reg. at 82,042.

72.     The 2020 Rule eliminates all requirements to provide notices to beneficiaries. It also eliminates the requirements that faith-based service providers provide a referral to an alternative provider upon request by a beneficiary, as well as the related obligation to provide notice of that right.[35]

73.     Conversely, the 2020 Rule expands notice requirements for the Agencies themselves, to the benefit of service providers. Agency funding announcements and contracts must now state that:

> [A]mong other things, a faith-based organization may apply for awards on the same basis as any other organization; a participating faith-based organization retains its independence and may carry out its mission consistent with—and may be able to seek an accommodation under—religious freedom (and conscience) protections in Federal law.[36]

74.     The 2020 Rule also reinforces and expands the ability of faith-based organizations to act religiously while using federal funds to provide social services. It changes the prohibition on agencies discriminating against faith-based organizations from discrimination "on the basis of [] religious character or affiliation," to include discrimination "on the basis of religious exercise."[37] And it adds an explicit statement that religious accommodations are available to faith-based service providers, even with respect to their ability to carry out eligible activities to meet program requirements.[38]

75.     The 2020 Rule also eliminates various restrictions on the religiosity of programs receiving indirect federal funding (typically through vouchers). It eliminates the requirement that

---

[35] *Id.* at 82,039. The funding opportunity announcement and contract must now include information about the prohibition on discrimination against beneficiaries on certain religious bases, but there is no requirement that this information be provided to the beneficiaries themselves. *Id.* at 82,040.

[36] *Id.* at 82,040. USAID alone did not adopt this specific language. *Id.*

[37] *Id.* at 82,085.

[38] *Id.*

a secular option be available under such programs. At the same time, the Rule now allows faith-based organizations receiving indirect federal funding to "require attendance in all activities that are fundamental to the program," including religious activities.[39] Accordingly, federal funding may now flow to programs that require participation in religious activities, even if no other program is available.

76.     The 2020 Rule also expands the religious exemption to the prohibition on nondiscrimination in employment, another way in which the Rule considers only the interests of religious providers.[40]

77.     These changes upset the careful balancing of interests arrived at through the 2016 Rule's consensus-based process. Indeed, the Institutional Religious Freedom Alliance, a coalition that works on behalf of "the religious freedom that faith-based organizations need in order to make their distinctive and best contributions to the common good," submitted a comment opposing the change to the definition of indirect funding and asking that the notice and referral requirement be expanded, not eliminated. As this coalition explained:

> We comment because we are convinced that the common good and religious freedom are best served when the regulations governing funding enjoy a substantial consensus. We are concerned that some of the changes proposed to the HHS Equal Treatment regulations—which date back to the Republican George W. Bush administration and which were amended but substantially maintained by the Democratic Barack Obama administration—will damage rather than sustain the hard-won consensus on Equal Treatment principles.

> … That consensus is possible because the principles seem fair to people who hold significantly different views on the advisability of government money going to religious organizations, the appropriateness of religious staffing, how religious entities should be held accountable, whether religion is positive or negative for beneficiaries, and more. Whether or not people agree fully with each feature of the principles or regulations, many appear to regard the overall package as fair. [The proposed indirect funding change] damages the fairness of the Equal

---

[39] *Id.* at 82,040.

[40] *Id.*

Treatment principles and regulations and will undermine the consensus that has been carefully fostered over more than two decades.[41]

## IV.     **The 2020 Rule Will Cause Widespread Harm**

78.     The Advisory Council Report that underlay the 2016 Rule explained, "[r]everberating through this report is a call for the concerns of people who are poor and vulnerable to be prioritized" and, with regard to faith-based partnerships with government, "we will always seek to make sure that the question of the impact on the poor is being asked."[42]

79.     The 2020 Rule neither asks nor answers this question. The concerns of poor and vulnerable beneficiaries of social service programs are hardly considered, despite being raised by commenters, and certainly are not prioritized by the Rule.

80.     Faith-based organizations provide a significant amount of federally funded social services.[43] Accordingly, the Rule's elimination of protections for beneficiaries receiving federally funded services from these providers has far-reaching consequences. It will make it more difficult for nonreligious people, members of minority faiths, and people whose identities are disapproved of or condemned by faith-based providers to obtain these federally funded, often essential services. It also makes it more difficult to report violations of the remaining nondiscrimination protections to the agencies providing funding.

---

[41] Institutional Religious Freedom Alliance, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 1, 2, 5 (Feb. 18, 2020) ("IRFA HHS Comment"), https://www.regulations.gov/document?D=HHS-OS-2020-0001-21174.

[42] Advisory Council Report at vi.

[43] In the mid-2000s, faith-based organizations received more than 17 percent of nine federal agencies' social service grants. *Roundtable Study Shows Faith-Based Groups Received Over 17 Percent of Federal Agency Social Service Grants*, PEW (Feb. 16, 2006), https://www.pewtrusts.org/en/about/news-room/press-releases-and-statements/2006/02/16/roundtable-study-shows-faithbased-groups-received-over-17-percent-of-federal-agency-social-service-funds.

81.     While some beneficiaries are comfortable receiving services from faith-based providers, many are not. Objections may originate from nonbelievers or people of another faith, or they may come from people, like sexually active single women, members of minority faiths, and LGBTQ people, who have traditionally been disapproved of or discriminated against by various religious organizations.[44] People who sincerely believe that the government should not be funding religious institutions, for any purpose, may also object.[45]

82.     As numerous comments explained, religiously motivated discrimination against beneficiaries is a substantial problem in the provision of social services. For example, from 2013 through 2020, Lambda Legal received tens of thousands of complaints related to discrimination based on sexual orientation and gender identity, many of which concerned problems accessing services of the type funded by the Agencies and subject to the 2016 and 2020 Rules.[46] The most frequent complaints concerned discrimination by healthcare providers and in child welfare (foster care) programs, social services often supported by federal funding from HHS. Complainants also commonly reported discrimination by organizations operating shelters and other services for people experiencing homelessness, and by organizations providing nursing and other rehabilitative care, as well as veterans services, all of which may be funded by various

---

[44] National Women's Law Center, Comment Letter on HUD Proposed Rule RIN 2501-AD91 at 3 (Apr. 13, 2020) ("NWLC HUD Comment"), https://www.regulations.gov/document?D=HUD-2020-0017-0483; Americans United for Separation of Church and State, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 4 (Feb. 18, 2020) ("AU HHS Comment"), https://www.regulations.gov/document?D=HHS-OS-2020-0001-20891.

[45] Coalition Against Religious Discrimination, Comment Letter on USDA Proposed Rule RIN 0510-AA08 at 3-4 (Feb. 18, 2020), https://www.regulations.gov/document?D=USDA-2020-0009-3115; NWLC HUD Comment at 3-4; American Atheists, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 7 (Feb. 18, 2020) ("AA HHS Comment"), https://beta.regulations.gov/comment/HHS-OS-2020-0001-19946.

[46] Lambda Legal, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 22 (Feb. 18, 2020) ("Lambda Legal HHS Comment"), https://www.regulations.gov/document?D=HHS-OS-2020-0001-22659.

Agency programs. Complainants further sought help coping with discrimination in programs to alleviate the effects of poverty, such as food stamps and other nutrition support, often supported with USDA or HHS funding.[47]

83.     As Lambda Legal explained, throughout the years that it kept records of help requests, religious condemnation of LGBT people has been consistently reported as a motivating factor for this discrimination and harassment.[48] Consistently, according to a 2013 survey by Pew Research Center:

> The religious basis for opposition to homosexuality is seen clearly in the reasons people give for saying it should be discouraged by society. By far the most frequently cited factors—mentioned by roughly half (52%) of those who say homosexuality should be discouraged—are moral objections to homosexuality, that it conflicts with religious beliefs, or that it goes against the Bible. No more than about one-in-ten cite any other reasons as to why homosexuality should be discouraged by society.[49]

84.     Nonreligious people also suffer from discrimination by faith-based providers of social services. In a recent study by American Atheists of nearly 34,000 nonreligious people, substantial numbers reported negative experiences in receiving mental health, substance abuse, reproductive health, and other health services because of their nonreligious identity, all of which are services frequently supported with federal funding.[50] The reported rates of discrimination for several types of services, including education and public services, were more than double for

---

[47] *Id.* at 22-23.

[48] *Id.* at 23.

[49] *In Gay Marriage Debate, Both Supporters and Opponents See Legal Recognition as "Inevitable,"* Pew Research Center (June 6, 2013), https://www.pewresearch.org/politics/2013/06/06/in-gay-marriage-debate-both-supporters-and-opponents-see-legal-recognition-as-inevitable/.

[50] AA HHS Comment at 9; S. Frazer, A. El-Shafei & A.M. Gill, *Reality Check: Being Nonreligious in America*, American Atheists (2020) ("*Reality Check*"), https://static1.squarespace.com/static/5d824da4727dfb5bd9e59d0c/t/5ec6d6d8e8da850b30521353/1590089442015/Reality+Check+-+Being+Nonreligious+in+America.

respondents living in "very religious" communities compared to those in communities that were "a little bit" or "not at all" religious."[51]

85.     Even in circumstances where a provider does not intend to discriminate against or appear hostile to beneficiaries, religious imagery or a casual and well-intentioned invitation to join in a prayer circle or to say grace before a federally funded congregate meal may make beneficiaries uncomfortable and unsure about whether they can refuse.[52] As HAF has observed, cultural norms make it especially difficult for people in the Bhutanese Hindu refugee community to refuse such invitations. And while such invitations may seem innocuous to religious people, American Atheists' survey of nonreligious people found that requests to join in religious observance contributed to a sense of stigma among the nonreligious, high levels of which correlated with a higher likelihood to screen positive for depression and to experience greater loneliness.[53]

86.     The notice requirements were created to protect beneficiaries' religious liberty in these types of circumstances.[54] HHS, for example, explained that "[t]he purpose of the notice is to make beneficiaries aware of their religious liberty protections and [the notice] helps to ensure that beneficiaries are not coerced or pressured along religious lines in order to obtain HHS-

---

[51] *Reality Check* at 37.

[52] American Civil Liberties Union, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 4 (Feb. 18, 2020) ("ACLU HHS Comment"), https://www.regulations.gov/document?D=HHS-OS-2020-0001-20967.

[53] *Reality Check* at 25-33.

[54] Advisory Council Report at 141; *see also* Melissa Rogers, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 3-4 (Feb. 18, 2020) ("Melissa Rogers HHS Comment"), https://beta.regulations.gov/document/HHS-OS-2020-0001-22690.

supported social service programs."[55] The other Agencies included substantially identical explanations for the notice requirement.[56]

87.     There is no reason to expect that individuals participating in affected programs would know that any particular social service provided by a private party is supported by federal funding, much less what rights that federal funding confers with respect to the provider. Accordingly, the now-eliminated notice requirements provided crucial information to beneficiaries—that their food box was federally funded, for example, and subject to associated protections—a fact that is not obvious when that food box is distributed by a church.[57]

88.     This information enables beneficiaries to protect their religious freedom. As one commenter explained, "people using government-funded social services . . . cannot exercise their rights if they aren't aware they have them. Refusing to inform beneficiaries of their rights leaves them vulnerable, not knowing providers can't subject them to discrimination, proselytization, and religious coercion when getting government-funded services."[58]

89.     Explicit notice of rights is even more important for many of the populations that receive federally funded social services, who may have language barriers and lower education levels, making it even less likely that they would know about, much less be able to advocate for,

---

[55] Implementation of Executive Order 13559 Updating Participation in Department of Health and Human Services Programs by Faith-Based or Religious Organizations and Providing for Equal Treatment of Department of Health and Human Services Program Participants, 80 Fed. Reg. 47,272, 47,276 (Aug. 6, 2015).

[56] *See* Equal Opportunity for Religious Organizations in USDA Programs: Implementation of E.O. 13559, 80 Fed. Reg. 47,244, 47,247; Equal Participation of Faith-Based Organizations in HUD Programs: Implementation of E.O. 13559, 80 Fed. Reg. 47,302, 47,306; Equal Protection of the Laws for Faith-Based and Community Organizations, 80 Fed. Reg. 47,340, 47,343.

[57] *See*, *e.g.*, 81 Fed. Reg. 19,355 at Appendix E (required language for notices).

[58] AU HHS Comment at 5; *see also* Melissa Rogers HHS Comment at 11-14.

their religious-liberty rights absent notice.[59] Such beneficiaries "may be more vulnerable to coercion to participate in religious activities—however subtle and even if not intended by the provider—if they mistakenly believe it is necessary for support."[60]

90.     The required information about reporting violations was also essential. Without an explicit way to report violations, beneficiaries have no readily apparent remedy for discrimination they experience. The Agencies admit as much—indeed, they justify removing this protection because they find it unnecessary to "rely[] on beneficiaries to safeguard their own rights," and will instead rely on the providers to do so,[61] even though the providers' interests do not necessarily align with the beneficiaries'.

91.     An affirmative statement of nondiscrimination also makes using services provided by a faith-based provider more welcoming to someone who fears disapproval or discrimination.

92.     The notice requirement also, importantly, informed and reminded provider staff and volunteers that, even though they are working or volunteering in a church, for example, the service they are providing is not a religious one, and they should keep their religious beliefs separate from this work.[62] To this end, as one commenter pointed out, staff interacting with beneficiaries "may be different from staff who read the Federal Register or the terms and conditions of an award."[63]

---

[59] Hindu American Foundation, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 3-4 (Feb. 18, 2020), https://beta.regulations.gov/comment/HHS-OS-2020-0001-20878; ACLU HHS Comment at 4.

[60] ACLU HHS Comment at 4.

[61] 85 Fed. Reg. at 82,053.

[62] As the Advisory Council explained, "[i]t is also essential that grantee agencies, particularly their staff and volunteers who interact directly with beneficiaries, are educated and trained with regard to these parameters [notice and referral rights]." Advisory Council Report at 141.

[63] Melissa Rogers HHS Comment at 10 n. 38.

93.     The Advisory Council further recommended including the referral requirement because "notice alone may be insufficient to protect the rights of an eligible beneficiary without the actual availability of an alternate means of receiving the service delivery."[64] Notice of the right to referral is also necessary because beneficiaries cannot be expected to intuit that right.[65]

94.     As commenters pointed out,

[P]roviders, who offer professional social services in their community and navigate the grantmaking system, are more likely than a beneficiary to know of other providers and are more capable of finding an alternative provider. Beneficiaries . . . are likely to face considerable challenges in finding an alternative provider: they may not understand where to look, have access to the internet or a library to do research, or have time because [for example] they have caregiving responsibilities or work two jobs. This harms the beneficiary and undermines the entire purpose of [a social service] program.[66]

95.     The Agencies were under no illusions when they finalized the 2016 Rule that the number of referrals would be significant.[67] They imposed the requirement anyway because, as commenters pointed out, "notifying beneficiaries that they may request an alternative provider is a matter of principle and such requests are important when made."[68]

96.     The changes to the indirect federal financial assistance requirements—classifying programs as indirect even when no secular programs are available and permitting providers to compel attendance at religious programming—are also harmful. Under the 2020 Rule, someone who obtains a federally funded voucher can "be coerced to participate in religious activities as a

---

[64] Advisory Council Report at 141.

[65] Melissa Rogers HHS Comment at 12.

[66] AU HHS Comment at 4-5.

[67] 81 Fed. Reg. at 19,366 (explaining that "the Agencies believe that the number of requests for referrals will be minimal").

[68] Melissa Rogers HHS Comment at 12.

condition of receiving government-funded services because the only providers to choose from are religious."[69]

97.     IRFA commented that the change to the indirect funding rules would permit a situation where only two providers of indirectly funded family-strengthening services operated in a city, "one a Protestant provider whose services include obligatory prayer, Bible study, and discipleship activities, and the other a Muslim provider whose services build on and incorporate Islamic spiritual practices." As a result, "every beneficiary to whom HHS desires to offer the family-strengthening services would be obliged, in order to receive those services, to participate in one or another variety of explicitly religious activities—activities and teachings that may conflict with a beneficiary's own deep religious or non-religious convictions."[70]

98.     Further, the Rule's elimination of protections impacts those already facing significant burdens. As is thoroughly documented in the comments, many populations who reasonably expect increased difficulty obtaining social services as a result of the 2020 Rule, including LGBTQ people and people living with HIV, women, certain minority faiths, and the nonreligious, already have disproportionate needs for and face barriers to obtaining these services[71] Similarly, for people seeking basic food services, "[t]he stigma and shame faced by

---

[69] AU HHS Comment at 18; *see also* IRFA HHS Comment at 2-5.

[70] IRFA HHS Comment at 2-3.

[71] LGBTQ people and people living with HIV already experience widespread discrimination, denials of care, inadequate care, and related health disparities, as well as disproportionate levels of poverty, food scarcity, homelessness, and other needs that are targeted by federal social service funding. *See* Lambda Legal HHS Comment at 4-22. The 2015 U.S. Transgender Survey reveals that "transgender people today face enormous disparities across a wide range [of] social health indicators and risk factors that [HHS's] programs seek to address." National Center for Transgender Equality, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 16 (Feb. 18, 2020) ("NCTE HHS Comment"), https://beta.regulations.gov/comment/HHS-OS-2020-0001-19973. These disparities result from widespread social stigma, rejection, discrimination, and violence against transgender people. *Id. See also* National Women's Law Center, Comment

vulnerable people seeking help to meet their basic human needs is already a significant barrier to receiving assistance."[72] Elimination of the 2016 Rule's religious liberty protections exacerbates these barriers.[73]

99.     A 2020 survey of LGBTQ people experiencing food insecurity found that, while many experiences at faith-based providers were positive, a substantial percentage were not. In the face of this rejection, many decided to forgo the needed food. As one transgender man explained,

> I would try to access the church food banks, it was difficult. Like, you go in there, and they just have this look on their face of like disgust,—you really don't wanna deal with them. You don't wanna deal with that. … You already emotionally defeated going into that situation, and then to get all of that, I was like I'd rather turn around and go back, figure this out a whole 'nother way.[74]

100.     Increased barriers to receiving services from faith-based providers are especially problematic in rural areas where secular options are less likely to be available. American Atheists has documented much higher rates of discrimination against the nonreligious in "very religious" communities, which were disproportionately identified in rural locations and small

---

Letter on HHS Proposed Rule RIN 0991-AC13 at 2 (Feb. 18, 2020), https://www.regulations.gov/document?D=HHS-OS-2020-0001-22679; AA HHS Comment at 9; Hindu American Foundation, Comment Letter on VA Proposed Rule RIN 2900-AQ75 at 2-3 (Feb. 18, 2020), https://www.regulations.gov/document?D=VA-2020-VACO-0003-4678.

[72] MAZON: A Jewish Response to Hunger, Comment Letter on USDA Proposed Rule RIN 0510-AA08 at 2 (Feb. 12, 2020) ("MAZON USDA Comment"), https://beta.regulations.gov/comment/USDA-2020-0009-2852.

[73] ACLU HHS Comment at 4.

[74] Bianca D.M. Wilson et al., *"We're Still Hungry": Lived Experiences with Food Insecurity and Food Programs Among LGBTQ People*, UCLA Williams Institute, 15 (June 2020) ("*We're Still Hungry"*), https://williamsinstitute.law.ucla.edu/publications/lgbtq-experiences-food-bank/.

towns.[75] Similarly, the 2020 survey of food insecurity among LGBTQ people found that the rural population surveyed were limited to mostly religiously affiliated charitable food services.[76]

101.    As commenters pointed out, the 2020 Rule also increases the likelihood of constructive denials of service by a religious provider via overt or hostile religious displays which are not tempered by explicit statements of nondiscrimination.[77]

102.    Commenters also explain that reduced access to social service programs, resulting from the 2020 Rule, carries substantial economic and non-economic costs. Federally funded social service programs are "wide-ranging and serve to advance individual and social goods, including health, education, housing security, and family well-being." Any additional barriers to programs harm "the health and financial security of individuals and their families by delaying or denying access to critical safety-net services and benefits."[78]

## V.    <u>The Legal Defects of the 2020 Rule</u>

103.    The Agencies received over 95,000 comments in response to their various proposed rules.[79] This massive public interest came even though eight of the nine Agencies (excepting HUD) permitted only thirty days for public comment, in contravention of Executive Order 12866.[80]

104.    Commenters pointed out many deficiencies and errors of analysis in the proposed rules. The final 2020 Rule did not correct these failings. It did not adequately account for the

---

[75] *Reality Check* at 34, 37.

[76] *We're Still Hungry* at 2.

[77] Lambda Legal HHS Comment at 28, Lambda Legal, Comment Letter on VA Proposed Rule RIN 2900-AQ75 at 27 (Feb. 18, 2020) ("Lambda Legal VA Comment"), https://www.regulations.gov/document?D=VA-2020-VACO-0003-4889.

[78] NCTE HHS Comment at 29-33.

[79] 85 Fed. Reg. at 82,040.

[80] Regulatory Planning and Review, 58 Fed. Reg. 51,735 (Sept. 30, 1993).

harm the Rule will cause, as presented in the comments, nor did it correct the many errors in reasoning and analysis that were pointed out in the comments. The lack of "reasoned decisionmaking" thus pervades the 2020 Rule in violation of the APA. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).

### A.    *The Agencies do not justify the need for a policy change.*

105.    The 2020 Rule's stated goal to protect the religious liberty of faith-based service providers is speculative, unsupported by evidence, and does not stand up to scrutiny.

106.    The Agencies admit that the actual compliance costs for the notice and referral requirement were "minimal," as they must, given that they argue that referrals were not widely requested.[81] Eliminating compliance costs cannot therefore justify the rule change.

107.    Nevertheless, the Agencies hypothesize, providing notice and an opportunity for referral "gave the impression that such religious providers were not favored or trusted to provide the particular social service in accordance with the general requirements of the law, were more likely to discriminate, or were more likely to be objectionable."[82] But the agencies do not cite to any complaints received, record evidence, or other factual basis to advance this assertion beyond conjecture.

108.    Similarly, the Agencies claim that the 2020 Rule will reduce barriers to faith-based organizations participating in providing federally funded social services, potentially increasing the overall national capacity for services, but point to no evidence that such supposed barriers have prevented a willing provider from seeking federal funding or any comprehensive analysis supporting such a theoretical outcome.[83] Nor is there likely to be any such supporting

---

[81] 85 Fed. Reg. at 82,063.

[82] *Id.*

[83] *Id.* at 82,097.

evidence or analysis, given the agencies' acknowledgment that the 2016 Rule imposed minimal concrete burdens.[84] Nor is there analysis that there is a lack of willing providers or that any theoretical increase in the number of providers outweighs the lost provision of services due to beneficiaries being turned away or discouraged from obtaining services due to the Rule change.

109.    The Agencies' legal justifications for the 2020 Rule—to avoid "tension" with Supreme Court case law and RFRA—are similarly inadequate.

110.    The Agencies assert that requiring faith-based providers, but not others, to provide notice and referrals was "in tension" with religious freedom protections set forth in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017).[85] But *Trinity Lutheran's* holding prohibits government funds from being denied simply because of a recipient's religious character, 137 S. Ct. at 2025—a protection already required by the 2016 Rule—nothing more.[86]

111.    And as to RFRA, as commenters pointed out, the Agencies do not even "assert confidence that there is a violation," but instead rely on vague theories about potential illegality, which are insufficient to justify the Rule change.[87]

112.    The Agencies argue the notice and referral requirements "were in tension with RFRA because they *could have* imposed a substantial burden [implicating RFRA protections] in certain circumstances."[88] The hypothetical example they give is of an organization that believes

---

[84] *Id.* at 82,106.

[85] 85 Fed. Reg. at 82,063.

[86] ACLU HHS Comment at 7; AU HHS Comment at 6-7.

[87] AU HHS Comment at 8.

[88] 85 Fed. Reg. at 82,065 (emphasis added).

it would be "complicit in grave sin" by referring a beneficiary for a service it would not provide and disapproved of.[89]

113.    But the 2016 Rule concerned referrals to an *alternate provider* that offers services "similar in substance and quality to those offered by the faith-based organization," 81 Fed. Reg. at 19,367), not referrals for a *particular or different service*. Acknowledging this reality, the Agencies admit that they "do not identify here any religion with such a complicity-based objection to the notice-and-referral requirements."[90] Nevertheless, they proceed to eliminate the notice and referral protections because they "cannot rule out the possibility" of such a scenario. 85 Fed. Reg. at 82,065.[91] Relying on such a speculative outcome is arbitrary and capricious.

114.    Further, the agencies' RFRA analysis relies on the assertion that faith-based organizations would be under "substantial pressure" to accept this hypothetical referral burden, because the organization could be faced with the choice of forgoing its belief or not accepting federal funding. But the Agencies dismiss out of hand the potential solution that, if this entirely unlikely occurrence truly amounted to a RFRA violation, a religious accommodation—which the 2020 Rule makes clear is available to federal funding recipients—would resolve this hypothetical concern.[92] Failing to seriously consider such an obvious alternative to the rule change is arbitrary and capricious.

---

[89] *Id.*

[90] *Id.*

[91] NCTE HHS Comment at 4.

[92] 85 Fed. Reg. at 82,065-66, 82,069-70.

115.    The inadequacy of the RFRA argument is underscored by the fact that, as commenters explained, the Agencies "previously considered RFRA in adopting the 2016 rule, and [they] present no reasoned analysis for discarding their previous conclusions now."[93]

116.    The Agencies are similarly incorrect that *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), supports eliminating the requirement that a secular option be available for programs funded with indirect federal financial assistance.[94] *Zelman* upheld a challenge to a voucher program because that program allowed for "true private choice" that *includes* a secular option. 536 U.S. at 662. The 2020 Rule's provision for voucher programs with no secular option does not allow for "true private choice" about how to exercise one's voucher and is thus inconsistent with *Zelman*.[95]

**B.    *The Agencies misunderstand and mischaracterize the benefits of the 2016 Rule's beneficiary protections, and do not account for the harms imposed by their elimination.***

117.    The Agencies' analysis of the harms resulting from the lost beneficiary protections from the 2016 Rule is inadequate and incomplete.

118.    The Agencies arbitrarily ignore the benefits of the notices themselves, which, as the Agencies previously concluded, make beneficiaries aware of their religious liberty protections and help ensure that beneficiaries are not coerced or pressured to take part in religious activity or submit to proselytization in order to obtain federally funded social service programs.

---

[93] NCTE HHS Comment at 5.
[94] 85 Fed. Reg. at 82,073.
[95] AU HHS Comment at 15-18.

119.    As one commenter noted: "If the Department has evidence of any other reliable and systematic way by which beneficiaries would learn about protections for their religious liberty, it should produce such evidence."[96]

120.    The Agencies produce no such evidence. Instead, they argue, without evidence, that beneficiaries might have also had discriminatory experiences when receiving services from secular organizations,[97] an argument that, if anything, counsels in favor of expanding notice rights, not eliminating them.

121.    The Agencies also ignore entirely the benefit of the notice in reminding providers themselves of their nondiscrimination obligations, bizarrely arguing that "[a]ny provider—faith-based or secular—is capable of discriminating on the basis of religion or incorporating religious elements into its programs."[98] Again, even if credible, this argument would counsel in favor of an expansion of notice requirements, not their elimination.

122.    The Agencies also arbitrarily ignore information presented by commenters about the difficulty that beneficiaries reasonably face in identifying an alternative provider on their own, including lack of English proficiency, internet or telephone access, stable housing, and the transportation, childcare, and time necessary to find an alternative.[99] Faced with numerous comments about these concerns, the Agencies summarily assert without any record evidence that "[b]eneficiaries are consumers of public information and are capable of researching available

---

[96] Melissa Rogers HHS Comment at 13.
[97] 85 Fed. Reg. at 82,050.
[98] *Id.*
[99] AU HHS Comment at 4-5.

providers and making informed decisions about whether to choose to receive social services

from secular or faith-based organizations."[100]

123. This conclusion is not credible in the context of particularly vulnerable

populations heavily reliant on federally funded social services, such as LGBTQ older people or

people experiencing homelessness. Someone receiving services ranging from "adult day care, to

providers coming to an older adult's home, to institutional care" is hardly well positioned to find

an alternate provider on their own.[101] Nor can a homeless LGBTQ teen easily undertake

independent research to find a safe and affirming shelter.[102] Rather, as Plaintiff MAZON

explained in its comment, "[i]n far too many circumstances, hungry individuals or families

would be faced with the Hobson's Choice of receiving food to satiate that hunger or leaving in

search of other options, while that hunger grows more and more unbearable."[103]

124. The Agencies ignore the trauma that many vulnerable people, including

transgender and non-binary people, have experienced in previous attempts to obtain essential

social services. Relatedly, they ignore the many comments explaining how elimination of

protections will drive vulnerable beneficiaries away from essential services.[104]

125. The Agencies also ignore concrete examples of harm presented in the comments.

Commenters provided examples of beneficiaries of federally funded social services who objected

---

[100] 85 Fed. Reg. at 82,053.

[101] Justice in Aging, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 3 (Feb. 18, 2020), https://beta.regulations.gov/comment/HHS-OS-2020-0001-21985.

[102] Lambda Legal HHS Comment at 15 ("[f]requently, homeless LGBT persons have great difficulty finding shelters that accept and respect them.").

[103] MAZON USDA Comment at 3 (describing Congregate and Home-Delivered Nutrition Programs).

[104] FORGE, Comment Letter on HHS Proposed Rule RIN 0991-AC13 (Feb. 18, 2020), https://beta.regulations.gov/comment/HHS-OS-2020-0001-19224; NCTE HHS Comment, *passim*.

to religious messaging from the faith-based providers. For example, a grandmother objected to messages such as "God will help you" in communications with a religious organization providing social services for her granddaughter, over whom she had temporary custody. Another beneficiary objected to having to receive early childhood intervention services funded by HHS from a religiously affiliated provider. In neither example was the beneficiary provided with an alternative provider.[105]

126.    Throughout their justifications for the 2020 Rule, the Agencies rely heavily on their assertion that they are not aware of any requested referrals. But the 2016 Rule required reporting only when a provider was *unable* to give a referral, not when it made a successful referral. As commenters point out, "[a] provider's 'inability' to give a referral is starkly different from whether patients requested referrals in the first place, much less whether the provider simply refused to give one."[106] Conflating the two different requirements is arbitrary. In fact, there are many reasons why the Agencies might not be aware of referrals—because referrals were provided successfully, for example—making the Agencies' analysis entirely incomplete.[107]

127.    The Agencies compound this mistake by analogizing to a single HHS program (SAMHSA), which has an independent requirement to report all referrals, not just unsuccessful ones. Because of the different reporting requirements, this comparison is entirely inapt. Even if the data were comparable, relying on it in this fashion arbitrarily extrapolates from the experience of a relative handful of faith-based service providers in one program to the entire

---

[105] AA HHS Comment at 8-9.

[106] Attorneys General, Comment Letter on HHS Proposed Rule RIN 0991-AC13 at 12 (Feb. 18, 2020), https://beta.regulations.gov/comment/HHS-OS-2020-0001-19458.

[107] AA HHS Comment at 7.

range of services funded by the Defendant Agencies.[108] The experience of these relatively few providers does not support a change of this magnitude.

128.     Relying on this meager and inapt comparison, the Agencies undertook no effort to gather systemic evidence regarding the frequency of referrals, such as a survey of providers or beneficiaries.[109] Such a complete lack of evidence does not support a rule change.

129.     Further, the 2020 Rule's decision to ignore the fact, which was documented in the comments, that some religious organizations have religiously motivated negative views about LGBTQ people and other vulnerable populations ignores a significant aspect of the problem. Relatedly, because the Agencies incorrectly conclude that the 2020 Rule will not reduce access to services, they fail to adequately consider the resulting economic and non-economic costs resulting from the increase in unmet social needs.[110]

130.     As to the change to the definition of indirect federal financial assistance, faced with comments explaining how the 2020 Rule permits situations in which a voucher recipient has no alternative to a faith-based organization, the Agencies argue that the beneficiary's use of that program's services is still "a function of private choice" and that, if the beneficiary is forced to participate in religious programming to receive services, that "would result from private choice."[111] But the beneficiary's only option in such circumstances is to receive services from a religious provider or not at all. The Agencies' characterization of this "choice" as voluntary is arbitrary and capricious. In contrast, under the 2016 Rule's definition of indirect federal financial assistance, if there was no adequate secular option in a particular region for a particular type of

---

[108] *Id.*

[109] Melissa Rogers HHS Comment at 12.

[110] *See*, *e.g.*, NCTE HHS Comment at 39-42.

[111] 85 Fed. Reg. at 82,074.

service, beneficiaries could still receive services from the available faith-based providers, but those providers were subject to nondiscrimination protections imposed on providers receiving direct federal financial assistance.[112]

131.   Consistent with the Agencies' failure to treat the harms caused by the 2020 Rule seriously, they also fail to consider other important aspects of the Rule's negative impact on agency-specific and agency-wide goals of making social services more accessible. These include the impact of the Rule on HHS's stated goals, such as in its "Healthy People 2020 initiative" to reduce health disparities suffered by LGBTQ people.[113] Similarly, the Agencies failed to consider how the Rule "would conflict with the goals and objectives of Home, Together: The Federal Strategic Plan to Prevent and End Homelessness, adopted by the U.S. Interagency Council on Homelessness, of which most of the Agencies are members," or the President's Ending the HIV Epidemic plan, or HHS's Strategy to Combat Opioid Abuse, Misuse, and Overdose.[114] And the VA failed to consider how the 2020 Rule in conjunction with its planned expansion of reliance on community-based social service providers would impact the availability of services to beneficiaries.[115] Moreover, the Agencies collectively failed to consider the Rule's impact on family well-being as required by Section 654 of the Treasury and General Government Appropriations Act of 1999.[116]

---

[112] *See*, *e.g.*, 81 Fed. Reg. at 19,426.

[113] Lambda Legal HHS Comment at 31-32.

[114] NCTE HHS Comment at 36-37.

[115] Lambda Legal VA Comment at 27.

[116] AU HHS Comment at 19-20.

**C.    The Agencies' reasoning is internally inconsistent.**

132.    The Agencies' justification for the 2020 Rule considers only the religious liberty interests of faith-based organizations, not those of beneficiaries.[117]

133.    The Agencies rely on nonquantifiable asserted religious liberty harms to faith-based organizations, but ignore the religious-liberty interests of beneficiaries receiving services from a religious provider that are detailed in the record. Indeed, without acknowledging that the government should have a particular interest in preventing unwanted imposition of religion in federally funded social services, the Agencies argue that "the referral requirement ignored a religious beneficiary's objection to receiving federally funded social services from a secular provider when the beneficiary was uncomfortable with the secular environment."[118] That one-sided approach is arbitrary.

134.    Consistent with this inconsistent reasoning, the Agencies find notice useful to providers, but not to beneficiaries. They add a notice of rights for faith-based providers to "ensure[] that faith-based organizations . . . are aware of [] governing Federal law" and to remind the Agencies themselves of their obligations to the organizations.[119] But they recognize no such value in the eliminated beneficiary notices, either to inform beneficiaries of their rights or to remind provider organizations of limitations on their conduct.[120]

135.    Similarly, the Agencies argue that the notice and referral requirements vindicated beneficiaries' rights under the Free Exercise Clause and RFRA only "perhaps in exceptional

---

[117] *See*, *e.g.*, NCTE HHS Comment at 5.
[118] 85 Fed. Reg. at 82,049.
[119] 85 Fed. Reg. at 82,094.
[120] *See* AU HHS Comment at 6.

circumstances better addressed if and when they arise," but refused to take such a case-by-case approach to the needs of faith-based organizations.[121]

### D. *The Agencies fail to justify their departure from Executive Order nondiscrimination requirements.*

136.     Relevant Executive Orders going back to 2002 have prohibited faith-based organizations receiving any kind of federal financial assistance from discriminating against beneficiaries based on their refusal to attend or participate in religious practices.[122] President Trump's amendments to these Executive Orders did not eliminate this protection.[123] Yet the Agencies now allow recipients of indirect federal financial assistance to require attendance at religious programming. The Agencies' failure to acknowledge or explain their contradiction with these Executive Orders is arbitrary and capricious.

### E. *The Agencies failed to consider reasonable alternatives.*

137.     Commenters suggested many alternatives to eliminating the rights provided to beneficiaries by the 2016 Rule, such as expanding the notice and referral requirement to all providers or requiring the agencies themselves to provide referrals instead of providers.[124] The Agencies do not meaningfully consider such options. Failure to do so is arbitrary and capricious.

## VI.     The 2020 Rules Injure Plaintiffs

### A. *MAZON*

138.     MAZON pursues its mission of ending hunger in the United States and Israel by working towards systemic change to address hunger and its root causes. For nearly 35 years, MAZON has been committed to ensuring that vulnerable people have access to the resources

---

[121] 85 Fed. Reg. at 82,048, 82,070.

[122] EO 13279 § 2(d); EO 13559 § 2(d)

[123] EO 13831.

[124] IRFA HHS Comment at 7-8.

they need to be able to put food on the table. MAZON is a leading voice on antihunger issues, especially those that involve low-income populations or problems that have been previously overlooked or ignored—this includes food insecurity among currently serving military families, veterans, single mothers, seniors (especially LGBTQ seniors), rural communities, Tribal Nations, and college students.

139.    The ongoing COVID-19 pandemic has made MAZON's work more pressing than ever. An estimated 37 million Americans struggled to put food on the table before COVID-19. The pandemic has swelled that number to approximately 54 million.[125]

140.    MAZON's work in the United States consists of several types of activities: (1) providing funding, training, and resources to its grantees and its other organizational partners in the most food insecure states in the U.S.; (2) maintaining a network of hundreds of former grantees with which MAZON shares information and resources on developing issues; (3) developing and implementing strategic initiatives focused on targeted communities at particular risk of hunger; (4) working with a network of synagogues to mobilize their congregations and communities to understand hunger in America and to work to end hunger; (5) educating the public, including students and teachers, about the ongoing hunger crisis in the United States; (6) coordinating its partners to respond to specific hunger-related issues in various states; and (7) advocating for and organizing on behalf of smart and effective public policy to address the root causes of hunger.

---

[125] Bridget Balch, *54 million people in America face food insecurity during the pandemic. It could have dire consequences for their health*, AAMC (Oct. 15, 2020), https://www.aamc.org/news-insights/54-million-people-america-face-food-insecurity-during-pandemic-it-could-have-dire-consequences-their.

141.     Hungry people already face significant barriers to accessing food. These barriers include shame, stigma, lack of information, and difficulty accessing services. And as discussed above, some groups of particularly vulnerable people face additional barriers stemming from disapproval and prejudice by service providers.

142.     The 2020 Rule frustrates MAZON's goal to end hunger in the United States.

143.     The 2020 Rule impacts numerous federal financial assistance programs that support antihunger work. These include nutrition services funded by the Older Americans Act and administered by HHS, which include both congregate meals (served in group settings) and home-delivered meals. The Rule also impacts USDA programs, including The Emergency Food Assistance Program (TEFAP), which distributes about half a billion dollars in food to food banks annually, and the Commodity Supplemental Food Program (CSFP), which provides nutrition support to order people. The 2020 Rule further impacts VA-funded programs, such as Supportive Services for Veteran Families (SSVF), which funds comprehensive services for very low-income veterans.

144.     A huge proportion of food distribution in the United States, including under these federally funded programs, is provided by religious institutions.[126] These religious institutions provide essential services, including congregate meals and food pantries.

145.     In MAZON's experience, Jewish people and others who are not coreligionists with a Christian church that is providing meals are often uncomfortable entering a sanctuary with

---

[126] Feeding America, the nation's largest domestic hunger-relief organization, estimates that their network of food banks, food pantries, and meal programs are 55 percent faith based. *Farm Bill Sign On Letter*, Feeding America, http://help.feedingamerica.org/site/PageNavigator/Farm_Bill_Signonletter42015.html;jsessionid=00000000.app206b?NONCE_TOKEN=B3E6F11F85199E3E75A8D12FBB0177B8 (last visited Jan. 15, 2021).

a crucifix on the wall or other religious iconography, even though doing so is necessary to obtain much needed food. Similarly, other people whose identities and families do not align with the beliefs of a faith-based provider, such as unmarried mothers or LGBTQ individuals or families, may be uncomfortable entering a provider's church or other house of worship to receive government-funded services. This discomfort compounds the already significant barriers to assistance that hungry people face.

146.    In MAZON's experience, the dilemma faced by a hungry person deciding whether to enter a house of worship from which they fear judgment or proselytization is exacerbated in rural or remote locations, where that person may not have other easily accessible options for obtaining food. Approximately 15% of rural households struggle with food insecurity on a regular basis, and COVID-19 has made the situation much worse.[127]

147.    The 2016 Rule's notice and referral requirements were essential to making religious spaces more inviting to non-coreligionists. This information empowered hungry individuals who were often not aware of these rights to advocate for themselves in the face of discrimination or other ill-treatment. It also served as an explicit invitation welcoming all who needed federally-funded food aid. As such, in MAZON's assessment, it reduced barriers to accessing food.

148.    MAZON believes that the notice requirement also served the purpose of reminding the service providers' employees and volunteers that services must be available to and

---

[127] *Priorities for Action: Responding to Growing Hunger Due to COVID-19*, MAZON (Mar. 18, 2020), https://mazon.org/inside-mazon/mazons-priorities-for-action-coronavirus-pandemic?stage=Stage.

respect the religious freedom of all hungry people, including non-coreligionists. Again, this consequence reduced barriers to accessing food.[128]

149.    Such reminders are necessary. Individuals working or volunteering at federally funded food distribution programs may not be aware of, or may choose not to comply with, existing non-discrimination requirements. They may simply think that because they are volunteering in a Christian church, a certain level of religiosity is appropriate. For example, churches that distribute federally funded food boxes will sometimes pray in person for recipients or include religious notes in the boxes—such as a letter informing the beneficiary that "all praise and honor goes to our great God Jehovah for his abundant provisions to us!"[129]

150.    Responding to the harmful changes imposed by the 2020 Rule will require MAZON to divert its limited resources, including money and staff time, in response.

151.    In direct response to the barriers to food access created by the 2020 Rule, MAZON has determined that it will need to undertake a know-your-rights campaign that will likely target single mothers and LGBTQ older people—groups that will face increased barriers to obtaining food as a result of the 2020 Rule. The campaign will inform beneficiaries about their right to be free from religious discrimination when receiving federally-funded services from a

---

[128] MAZON believes this in part because of a Government Accountability Office ("GAO") report that reveals that prior to the 2016 Rule, a significant number of faith-based organizations stated that they understood the prohibition on providing inherently religious activities with direct federal funding. Nevertheless, they still engaged in impermissible religious activities at the same time and location as federally funded services (e.g. prayer with a beneficiary). GAO, GAO-06-616, Faith-Based and Community Initiative: Improvements in Monitoring Grantees and Measuring Performance Could Enforce Accountability (June 2006), https://www.gao.gov/new.items/d06616.pdf.

[129] Jessica Fu & H. Claire Brown, "*Please take a moment to thank Jehovah": Churches distributing USDA food boxes are blurring the boundaries between church and state*, The Counter, Sept. 29, 2020, https://thecounter.org/churches-usda-covid-19-food-boxes-boundaries-church-and-state/.

faith-based provider and what those rights include and do not include. MAZON also anticipates that it may need to provide additional funding to organizations to which it provides grants to run complimentary educational campaigns.

152.    MAZON anticipates that its education campaign will also focus on the 2020 Rule's changes to programs receiving indirect federal funding (such as voucher feeding programs funded by HHS through the Older Americans Act). Now that faith-based recipients of indirect federal financial assistance may require participants to attend religious activities and there is no requirement that a secular option be available, MAZON anticipates that beneficiaries, such as recipients of HHS childcare vouchers, who object to doing so will be faced with the choice of forgoing services or participating in required religious programming that may be contrary to their beliefs. As a result of the 2020 Rule, many single mothers will be faced with the unacceptable choice of securing childcare only if they acquiesce to religious programming or risk losing Supplemental Nutrition Assistance Program ("SNAP") benefits because they cannot meet the SNAP work requirements without childcare. MAZON anticipates addressing these issues in its planned education campaign. For regions in which a secular option remains available, MAZON is prepared to engage in or provide financial support for education campaigns to make beneficiaries aware of that option should they object to participation in religious services that may now be required by a faith-based provider.

153.    MAZON is prepared to aim its education campaigns at beneficiaries of the TEFAP and CSFP program run by USDA, the SSVF program run by the VA, and meals funded by HHS through OAA funding, as well as HHS's voucher program for childcare.

154.    As part of MAZON's mission, it previously has undertaken similar know-your-rights work to lower barriers to food access. In addition to running its own campaigns, it

frequently supports these campaigns, and plans to do so for the 2020 Rule, with its quick response fund. For example, when Oregon expanded the eligibility of college students to access SNAP benefits, many students facing hunger were unaware of their new eligibility. MAZON funded a comprehensive education campaign conducted by Hunger Free Oregon to raise awareness among college students and to provide information about how to access the benefits.

155.    Creating an effective education campaign, such as the one MAZON is planning for the 2020 Rule, takes a significant amount of staff time. MAZON staff will review and analyze the impact of the final rule on federal antihunger funding streams. Because the campaign will be conducted in concert with one or more of MAZON's grantees, MAZON's Grants Director will spend time reviewing the work of MAZON's grantees and conducting interviews with grantee partner staff to determine which programs are effective, how they could be emulated, and where there are gaps in funding that MAZON may be able to address. MAZON will hire a contractor to design a campaign that is accessible to its intended audience. MAZON's communications staff will also spend time reviewing the planned language to ensure that it is clear. Once the language is finalized, MAZON will hire a contractor to convert the language both into a webtool and a printed product available for distribution. MAZON and its grantees will spend time determining how to distribute the information and ensuring that the distribution is successful. All told, the know-your-rights campaign work will take a substantial amount of staff time for multiple MAZON employees. It will also require financial outlays, including hiring one or more contractors and funding one or more supplemental grants.

156.    MAZON anticipates that its planned education campaign would continue in some form as long as the 2020 Rule is in force. Maintaining the campaign will require significant periodic staff time and monetary expenditures to update and republish or republicize materials.

157.    MAZON further anticipates expending staff time and financial resources to make up for the 2020 Rule's elimination of the requirement that faith-based service providers give referrals. MAZON may be forced to attempt to compensate for the loss of referrals by seeking out potential grantees that could provide referral information to beneficiaries or creating its own resource with information on alternative providers. MAZON has done similar work recently. For example, MAZON is structured to be able to respond very quickly to emergent situations such as the coronavirus pandemic. At the beginning of the coronavirus pandemic, as its economic impact and the corresponding rise in hunger became clear, MAZON created a detailed guide on food resources available in the fifty states.[130]

**B.    *SAGE***

158.    SAGE accomplishes its mission to allow LGBTQ older people to age with respect and dignity through a variety of programs, including providing direct services through its "SAGE Centers" in New York City, as well as providing training, resources, and technical assistance through various programs, coordinating its network of affiliates nationwide, and advocating for policies, systems, and protections at the federal and state levels to meet the needs of LGBTQ older people.

159.    New York City's metro area is home to the largest LGBTQ population in the United States and is the historic epicenter of the nation's gay rights movement. As a recent City survey found, however, "the stark reality is that LGBTQ people in New York … continue to face

---

[130] Alexis Miller & Sarah Steinberg, *50-State Hunger Resource Guide*, MAZON: A Jewish Response to Hunger, Mar. 18, 2020, https://mazon.org/inside-mazon/charitable-food-resource-guide-during-covid-19 ("Over the coming days and weeks, we will act as an information clearinghouse for the most-up-to date information from these states as we work to ensure essential services, government benefits and food assistance are available to all who need them.").

discrimination, harassment, and violence as a result of their sexual orientation or gender identity."[131]

160.    Through its New York City Centers, SAGE provides holistic coordinated care to LGBTQ older people and the people who support them. These services include information and referrals, case management, benefits and entitlement assistance, caregiving issues, services focused on LGBTQ veterans and for people living with HIV, and various support groups. The need for housing services is especially acute.

161.    Understanding the perspective of LGBTQ older adults requires understanding that when they were younger, discrimination was much more widespread and broadly acceptable than it is now. Accordingly, many LGBTQ older adults experienced discrimination, and in particular, being shunned or pushed out of religious communities. That history has left many LGBTQ older adults especially wary of discrimination by any form of organized religion, let alone by the specific denomination from which they experienced it firsthand.

162.    The people SAGE serves through its Centers have also frequently experienced discrimination by faith-based service providers when attempting to access federally funded social services. This discrimination often stems from negative religious beliefs about LGBTQ people. For example, transgender people SAGE serves have been refused housing and mental healthcare by faith-based housing service providers because of those providers' religious beliefs that being transgender is against God's will.

163.    One nation-wide faith-based organization, which receives federal funds for various social service programs, including a wide variety of HHS and other agency funding

---

[131] *Results of a Survey of LGBTQ New Yorkers*, New York City Comptroller (June 20, 2017), https://comptroller.nyc.gov/reports/results-of-a-survey-of-lgbtq-new-yorkers/.

streams, has a large presence in New York City, providing anti-hunger and housing services, among others. SAGE's clients are aware that there is pressure to participate in religious programming, which is hostile to LGBTQ people, as part of receiving services. SAGE's referrals to this provider are often rejected when offered because of this history, compromising its ability to make successful referrals.

164.    For many of the people SAGE serves, the combination of past trauma resulting from discrimination rooted in religious belief and fear of future discrimination is an insurmountable barrier to seeking services from a faith-based provider. SAGE has observed that this problem is especially acute for transgender people who are afraid of being "outed" by a faith-based housing services provider.

165.    Providing a comprehensive notice of rights, as well as the requirement that objecting beneficiaries receive a referral, makes services more accessible to LGBTQ people fearing religiously-motivated discrimination. This increased accessibility would make it easier for SAGE to provide its comprehensive care services, because it increases the universe of organizations to which it could successfully refer clients. Without universal notices, as required by the 2016 Rule, SAGE anticipates that religiously affiliated providers and their staff will continue to be significantly underutilized by its clients out of a fear of discrimination. Further, a more limited pool of potential acceptable referrals makes it more time-consuming for SAGE staff to identify appropriate and successful referrals for their clients. Similarly, without the welcome that a nondiscrimination notice provides, SAGE staff will have to spend more time encouraging their clients to take advantage of available services and supporting them in ensuring that their experiences with the service providers are safe and affirming.

166.    SAGE anticipates that the Rule will require it to spend additional staff time providing case management support for clients who need services funded by HHS Older Americans Act funding streams, as well as permanent and supportive housing, shelter, meals (including food pantries and congregate meal programs), and mental health services programs, many of which are funded by HUD and USDA.

167.    The 2020 Rule will also force SAGE to divert its limited resources to provide training resources for its nationwide network of affiliates. The impact of the 2020 Rule will be especially acute in regions with a limited pool of social service providers, fewer statutory nondiscrimination protections, and more religiously motivated hostility to LGBTQ people. SAGE anticipates putting together a tool kit to inform affiliates about the 2020 Rule and how to support LGBTQ older people in continuing to receive necessary services without the assurances that the 2016 Rule's notice requirement provided.

## C.    *The NYC Anti-Violence Project*

172.    AVP was founded by community activists because city authorities failed to respond to brutal attacks on gay and HIV-affected men. Its work is motivated by an understanding that LGBTQ and HIV-affected ("LGBTQ/H") survivors of violence and their allies must speak out, demand change, and find or create culturally competent services because existing institutions often fail to acknowledge, let alone meet, the community's needs. Many mainstream providers operate with heteronormative assumptions, such as that domestic violence consists only of men's violence against women and that gender is binary and ascertained at birth. Too often, these providers refuse to serve men and do not respect transgender identity. Accordingly, AVP provides a broad range of services to LGBTQ/H survivors of all forms of violence and to those who love and support them, and has become a national leader in training,

education, and advocacy about the ways to address anti-LGBTQ marginalization, discrimination, hate violence, police violence, intimate partner violence, and sexual violence.

173.     AVP's services include a 24/7 English-Spanish anti-violence crisis hotline, counseling, safety planning, support groups, legal consultation and representation, economic empowerment services, advocacy, information, and diverse range of referrals. All services are free and confidential. Last fiscal year, AVP engaged and served over 13,000 LGBTQ/H survivors of violence and service providers throughout New York City through its hotline (2,200), counseling and legal services (1,400), outreach and organizing efforts (7,000), and trainings (2,800).

174.     The coronavirus pandemic and associated economic downturn have increased demand for referrals provided through AVP's hotline and counseling services for hunger relief, housing, job retraining, addiction recovery, and medical care, as well as the legal and trauma recovery services that AVP provides.

175.     Many of the organizations providing the services needed by the community AVP serves are faith-based and are of the type supported by direct federal funding. Although some of these organizations are welcoming to LGBTQ/H people, many community members perceive faith-based providers as potentially unwelcoming due to prior experiences of religion-based rejection and discrimination, which makes many of them hesitant to seek or continue to receive services from these providers.[132]

176.     AVP's Community Organizing and Public Advocacy department provides

---

[132] Tanenbaum, *Faith Based Healthcare and the LGBT Community: Opportunities and Barriers for Equitable Care*, at 14 (2020) (citing Pew Research Center findings and research by San Francisco State University's Family Acceptance Project), https://tanenbaum.org/wp-content/uploads/2020/05/Faith-Based-Health-Care-LGBTQ.pdf.

community outreach and education, professional training, community organizing, leadership development, and policy advocacy. Among its many projects, this department coordinates the National Coalition of Anti-Violence Programs and hosts the National Training and Technical Assistance Center on LGBTQ Cultural Competency. This Center helps organizations become inclusive of LGBTQ survivors through assistance on terminology, LGBTQ-inclusive policies, building relationships with LGBTQ communities, and more.

177.    Many domestic violence programs are run by faith-based organizations operated according to religious tenets including that same-sex relationships are sinful, and that gender is binary and a Divine gift to be embraced. Such programs often effectively deny LGBTQ survivors full access to services, including safe shelter, because they refuse to respect transgender and nonbinary identities. Moreover, some providers guided by anti-LGBTQ religious beliefs tell survivors that intimate partner violence is to be expected in same-sex relationships because those relationships are inherently wrong.

178.    Compounding this problem, LGBTQ survivors already face significant barriers to accessing services.[133] The situation tends to be even worse for transgender survivors of intimate partner and sexual violence, many of whom delay seeking healthcare because they expect discrimination.[134] Many clients reach AVP having not received adequate services because they

---

[133] National Center for Victims of Crime & NCAVP, *Why It Matters: Rethinking Victim Assistance for Lesbian, Gay, Bisexual, Transgender, and Queer Victims of Hate Violence & Intimate Partner Violence* (March 2010) (finding that 94% of providers said they did not serve LGBTQ survivors), http://avp.org/wp-content/uploads/2019/02/WhyItMatters.pdf; Joan C. McClennen, *Domestic Violence Between Same-Gender Partners: Recent Findings and Future Research*, 20 J. Interpersonal Violence 149 (2005) (finding that only one fifth of LGBTQ IPV/SV survivors received services), https://journals.sagepub.com/doi/10.1177/0886260 504268762.

[134] Kristie L. Seelman *et al.*, *Transgender Noninclusive Healthcare and Delaying Care Because of Fear: Connections to General Health and Mental Health Among Transgender Adults*, 2

felt uncomfortable receiving services from faith-based providers, and others received services from professionals who mistreated them due to religious beliefs or assumptions, all of which reinforces and magnifies the clients' trauma. This harm to their clients makes AVP's staff's work more difficult and time-consuming.

179.     The 2020 Rule will impair AVP's ability to pursue its mission of assisting survivors of violence and their loved ones, and of reducing anti-LGBTQ violence because, as AVP anticipates, it will increase the trauma and related problems of people who seek AVP's services and because it will require AVP to divert additional resources to community education and outreach.

180.     An important part of AVP's work is assisting survivors in overcoming barriers to receiving services and supporting them in finding safe and affirming service providers. When community members do not know they are entitled to services in a religiously neutral context, as the 2016 Rule required, some will continue to receive services in circumstances that exacerbate their trauma and put further stress on their emotional state. Others will go without needed services. Both options increase harm and mean those clients will require more time and resources for their recovery process once they reach AVP or other welcoming providers.[135] AVP anticipates that the 2020 Rule will increase these outcomes. This means AVP will be able to

---

Transgender Health 17-28 (Dec. 2017), DOI: 10.1089/trgh.2016.0024, https://www.liebertpub.com/doi/full/10.1089/trgh.2016.0024.

[135] For example, for a young LGBTQ person who experienced violence at home due to a family member's religiously motivated condemnation of the young person's identity, faith-based agencies known to teach similar views are unlikely to feel safe and facilitate recovery. For an LGBTQ adult trying to escape intimate partner violence, it can be counterproductive and dangerous to receive counseling from those who express a religious view that it is a sin to leave one's spouse or that it is a sin to be in a same-sex relationship. For a single parent who has been traumatized by violence in any context, it similarly can reinforce the emotional harm to be told that the harm is to be expected and endured as a consequence of the sin of non-marital parenthood.

serve fewer people with its current direct services resources, and that it will need to divert resources from other programs both for those services and for community education to provide nondiscrimination information and referrals that should be provided by federally funded faith-based organizations.

181.    Moreover, a significant amount of AVP's legal services are provided to immigrants who need not only trauma-recovery services but also help seeking asylum based on the anti-LGBTQ or HIV-related persecution they suffered in their country of origin. Many face language barriers and most know little about U.S. law. It is absurd to think that, without information posted on site by service providers or otherwise readily available, this population will understand their rights vis a vis a faith-based provider.

182.    AVP understands that people it serves often do not complain about proselytizing or religion-based discrimination, or request referrals to other providers if they do not know they have the right to services in a religiously neutral environment. To compensate as much as possible for the 2020 Rule's elimination of the notice and referral requirement, AVP now plans to expand its public education efforts to provide this information. Doing so will require AVP to create new material for posting on its website, for training its hotline staff, support group leaders, and legal and client services staff, and for its training curricula and other technical assistance material. Because many community members who need AVP's services get information through word of mouth, AVP also will distribute this new information through briefings of its network of local community leaders, its statewide advocacy network, and its national coalition of anti-violence organizations.

183.    Creating this information and then distributing it through these multiple channels will require diverting resources in the form of staff time and funding from other currently

planned activities.

184.     AVP also is planning to provide additional emotional supports for its existing staff, and to pursue additional funding to increase its staffing. It is doing so because it is more stressful and emotionally draining to serve clients who have experienced additional or compounded trauma, or have gone longer without receiving needed services, and AVP anticipates that the Rule will increase these circumstances. COVID-19 already has increased the client load and the pressure on AVP's staff. Since the pandemic began, AVP has lost several community leaders and clients to this disease and has seen a marked increase in suicidality among community members both in calls to its hotline and with existing clients, which have taken an enormous emotional toll on staff. Because AVP's existing staff already is stretched beyond sustainable levels and AVP anticipates that the Rule will further increase the demands on them, the organization now must pursue additional staffing resources.

### D.     *Ark of Freedom Alliance*

184.     AFA provides services to children, LGBTQ youth and young adults, youth in and aging out of foster care, and young adult male survivors of violence, human trafficking, and exploitation, with a particular focus on those experiencing homelessness, with mental health disorders, or struggling with addiction.

185.     AFA provides a variety of support services to youth and young adults, including education, housing, mental health services, and economic empowerment. As part of its service array, AFA offers case management services for clients who are at high risk of victimization. Case management services prioritize stabilizing clients by connecting them with services and assistance in the areas of education, nutritional literacy, financial support, workforce empowerment and employment, housing, behavioral health, substance abuse treatment, and strategies to exit trafficking arrangements. Case managers work with clients to jointly identify

needs, to establish goals, and to navigate an array of service providers. AFA partners with organizations such as FLITE Center, which serves youth who are aging out of foster care (many of whom are beneficiaries of foster care funding from HHS), to provide job readiness and vocational training. AFA also provides preventative outreach, mentoring, and education to youth at risk of exploitation as a result of homelessness, anti-LGBTQ discrimination, histories of abuse, substance abuse, mental health challenges, barriers to employment, or involvement with juvenile and criminal justice systems. AFA further does substantial outreach, training, and education work for the community, law enforcement, service providers, and child welfare system professionals and stakeholders about male and LGBTQ youth and young adult survivors of trafficking.

186.    The 2020 Rule impairs AFA's ability to provide these services, will require AFA to divert its limited resources, and will negatively impact its clients, who are beneficiaries of programs receiving federal financial assistance from HHS, HUD, DOJ, and DOL, among others.

187.    Faith-based providers are active in the areas in which AFA works, providing foster care services, antitrafficking programs, food assistance, substance abuse treatment, and housing services. Housing is among the most critical needs of AFA clients, and stable housing is essential to reduce risk of trafficking. As a result of surviving trafficking and experiencing other forms of trauma, including trauma from discrimination related to their LGBTQ identity or expression, virtually all AFA clients need mental health services and the majority have co-occurring challenges with substance abuse. The economic disruption from the coronavirus pandemic has exacerbated AFA's clients' needs for housing and food assistance and added to financial strain due to few employment options. Many of the services that are essential for AFA clients are supported with federal funding, such as DOJ grants for anti-trafficking and anti-

violence work; HUD funding for housing and shelter programs, HHS funding for foster care services, behavioral health and substance abuse treatment, and DOL funding for youth-focused employment and job-readiness programs.

188.    Many of AFA's clients have been discriminated against by or suffered other trauma from interacting with a faith-based organization or have experienced abuse or discrimination motivated by religious beliefs about LGBTQ people from family members and in their communities. Because of this past harm, exposure to religious messaging may be triggering, resulting in trauma, and may result in refusing services (such as leaving housing that was a youth's only option). For youth in the foster care system who are placed in residential programs or shelters by the state, running away can mean further risk of trafficking or involvement with law enforcement because the youth is "out of compliance" or "on runaway status." At times youth are simply returned by the state to such placements because there is no other placement option for them.

189.    These past experiences typically make AFA's clients more skeptical of engaging with other faith-based service providers or other parts of "the system." As a result, they often forgo essential services. For example, one AFA client who is nonbinary refused to go to a faith-based shelter, their only option for temporary emergency housing in the area. As a result, AFA had to counsel the client about how to protect themselves as much as possible while spending the night in a dumpster and how to reduce harm as much as possible if eating from the dumpster.

190.    AFA's clients typically are unaware of whether a service provider receives federal funding, or that the receipt of funding provides beneficiaries with nondiscrimination protections. These youth and young adults simply do not know that they can refuse to attend religious services provided by their emergency housing shelter, for example. Further, many providers

whose services AFA clients use do require participation in religious services and prayer, making it difficult to know when it is possible to refuse.

191.    When AFA accepts a client, its staff spend time getting to know the young person, building rapport, and developing a treatment plan. Identifying culturally appropriate referrals for youth it serves requires AFA staff time and resources. This work is more difficult and time consuming for AFA clients who have had past negative experiences with service providers, because of those clients' fear of future trauma or discrimination. This case management work also includes advising AFA clients on how to navigate receiving services from faith-based providers. Because of the prevalence of faith-based providers, AFA has had to divert resources to vetting providers before it can safely refer clients. On one such visit to vet a federally funded provider, AFA staff noted that a bible was present on the nightstand beside each bed. This option was the only residential program in the area for LGBTQ survivors of trafficking. Having observed the bibles, AFA had to spend additional time counseling clients who had experienced religiously motivated discrimination on how to use this provider's services.

192.    AFA's individually tailored and time-consuming case management approach is essential, however, because a bad match with a service provider may result in the young person not accepting services, not receiving needed treatment, and continuing to be exploited by traffickers for a longer period. Building a relationship of trust is essential for youth and young adults to engage with AFA. If AFA were to make a referral to a provider that discriminates on the basis of religion or religious belief, the relationship of trust will be negatively impacted. As a result, the youth may no longer engage with AFA, placing themselves at increased risk of harm.

193.    AFA believes that the 2020 Rule's elimination of the notice and referral requirement will make this mission-critical work more time-consuming and difficult.

194.     It is more difficult and time-consuming for AFA to support a client in seeking services from a faith-based provider absent the ability to advise clients that they will be informed ahead of time of the nature of a provider, their rights, and their options to obtain services from an alternate provider. If AFA is not able to rely on the 2016 Rule's requirement that providers must inform youth of their rights and alternatives, it must invest additional time and resources to vet providers. The ability to build trust and accurately explain what a youth may expect when accessing services allows AFA to empower youth to make informed decisions. Without this option, AFA's clients are exposed to harm and at risk of more harm due to loss of needed services, increasing their reliance on AFA and causing it to divert resources to assisting youth with navigating service provision and away from other essential services.

195.     The notice requirement empowers beneficiaries to refuse to attend religious programming or to evaluate whether engaging with the provider is less harmful than the alternative of no services at all. Attending the programming may exacerbate their past trauma, making it less likely that they will continue to receive services from the faith-based service provider in question or be willing to receive services from another such provider in the future. If youth are unable to obtain necessary services, they are likely to remain at risk and return to AFA, limiting AFA's ability to reach additional youth in need of its services. Or if they are exposed to additional trauma from engaging in faith-based services unwittingly, they may return to AFA with even higher needs for mental health services or substance abuse treatment.

196.     With the 2020 Rule in place, without diverting resources to additional vetting of providers, AFA risks harming its trust relationship with youth. A crucial component of this relationship is that youth see AFA as a source of accurate information regarding providers. Also, youth refer other youth to AFA for services. If youth hear from their peers that AFA is not a

trustworthy organization, fewer youth will access AFA's services, and as a result will continue to be exposed to harm.

### E.    *Freedom from Religion Foundation*

197.    FFRF's mission is to educate about nontheism and to preserve the cherished constitutional principle of separation between religion and government. As part of this mission, FFRF staff work on behalf of individuals impacted by violations of church-state separation to resolve their concerns by informing the violators about their legal obligations and persuading them to comply with the law. When these efforts are unsuccessful, FFRF also seeks to redress violations through legal challenges where appropriate.

198.    FFRF also promotes its mission through its educational work. It publishes a newspaper,[136] blog,[137] radio show,[138] and weekly TV show. It also undertakes periodic issue-specific educational campaigns, particularly when vulnerable populations are subject to civil-rights violations. For example, FFRF previously has undertaken mass mailings to school superintendents and school principals to educate them on First Amendment issues impacting their students. Similarly, in another campaign, FFRF contacted over 1,000 public-university students who were members of football programs that engaged in unconstitutional promotion of religion.

199.    As a result of the 2020 Rule, FFRF plans to spend additional time and resources educating beneficiaries and providers who take part in the various Agencies' social service programs about the rights of participants. This campaign will continue as long as the 2020 Rule is in force. First, FFRF has begun creating informational resources in the form of know-your-

---

[136] Freethought Today, https://www.freethoughttoday.com/.

[137] Patheos: Freethought Now, https://www.patheos.com/blogs/freethoughtnow/.

[138] FFRF: Freethought Radio Archives, https://ffrf.org/news/radio/shows.

rights material for program participants, for distribution on its website, via email, and social media. Second, FFRF plans to host an episode of its "Ask an Atheist" video series, which is broadcast live on FFRF's Facebook page, which has more than 450,000 followers. FFRF also will perform research to identify targeted audiences for its campaign, including research identifying specific communities receiving benefits under USDA and HHS food distribution programs.

200.     FFRF is planning to conduct an education campaign directed at faith-based entities that receive federal financial assistance, to remind them of the remaining nondiscrimination requirements under the 2020 Rule, which is necessary now that the notice requirement has been eliminated. FFRF further plans to conduct an education campaign directed at secular organizations that serve vulnerable populations to enable those organizations to support the people they serve in advocating for themselves when receiving services from faith-based organizations.

201.     These educational campaigns will require use of FFRF's limited resources, including staff time to conduct research, put the educational materials together, identify target audiences for the materials, and distribute them, as well as financial resources to print and mail said materials. FFRF may also place paid advertisements in one or more city street newspapers, which are often distributed by persons experiencing homelessness, to reach beneficiaries of social services.

202.     FFRF also promotes its mission through its complaint program. Anyone may submit a complaint through a webform on FFRF's website. FFRF receives thousands of requests a year from its members and the general public to assist with complaints regarding church-state separation.

203.    FFRF acts on hundreds of these complaints each year. For complaints it chooses to pursue, FFRF legal staff review the complaint and contact the complainant to obtain additional facts about the incident in question.

204.    For complaints that it decides to pursue further, FFRF typically first sends a letter to the entity alleged to have committed the violation. If direct communications do not successfully resolve the problem, FFRF may take further action, such as filing a complaint with the relevant government regulator (for private organizations) or initiating litigation.

205.    FFRF has in the past pursued complaints about faith-based organizations receiving federal financial assistance. It has received such complaints regarding USDA funding for child nutrition programs and HHS funding through various funding streams, including Social Security block-grant funding for senior centers, early childhood intervention funding, and Older Americans Act funding.

206.    FFRF has also submitted a complaint based on public reporting about a DOJ grant for anti-human trafficking work that funded an organization requiring attendance at religious programming.

207.    FFRF anticipates that the 2020 Rule will make the work it does in its complaint program more difficult. First, beneficiaries who will no longer receive notices of their rights are less likely to be aware of those rights and, correspondingly, to contact FFRF for assistance when those rights are violated. FFRF will have to devote resources to the education campaigns discussed above to make up for this lack of notice, but even so, these campaigns are less likely to reach people than the eliminated notices. FFRF's ability to assist affected beneficiaries pursuant to its mission will therefore be compromised. Second, nondiscrimination notices establish that the provider organization received federal funding, a fact that can be time consuming to

determine, especially for sub-grantees. Without such notices, FFRF will have to undertake hours of additional time researching whether complaints received about providers relate to federally-funded programs.

208.    FFRF has also helped people deal with unwanted religiosity in programs treated as indirect federal funding under the 2016 Rule, such as those funded by USDA's Child Nutrition Programs. For example, in 2017, it assisted a complainant faced with proselytizing at a summer-meal program site run by a faith-based organization (which was not a school). Lunches at the site began with a call to prayer and were accompanied by evangelical programming on the television. The 2020 Rule makes it more difficult for FFRF to pursue its mission in these circumstances because the Rule now permits programs receiving indirect federal funding, which the Agencies previously stated include Child Nutrition Programs, to require attendance at religious programming or activities. Accordingly, FFRF will have to spend more time assisting the beneficiaries in locating an alternative provider (if one exists). In any geographic area, it may take several hours to locate a provider who provides similar services but does not mandate participation in religious activities.

### F.    *American Atheists*

209.    American Atheists' mission is to achieve religious equality for all Americans by protecting what Thomas Jefferson called the "wall of separation" between government and religion created by the First Amendment. AA promotes the understanding and inclusion of atheism and atheists. AA's work includes education, outreach, advocacy, legal support, and community-building to end the stigma associated with being an atheist in America.

210.    As part of this mission, AA receives complaints about violations of the separation of religion and government, religious coercion, and other civil rights issues affecting

nonreligious people, and it attempts to resolve such issues through outreach, education, negotiation, and if necessary, litigation.

211. The 2020 Rule's elimination of the notice and referral requirements makes it more difficult for AA to pursue its mission. The notice provided essential information about religious freedom protections, of which beneficiaries of federally funded social services programs were unlikely to be aware. This information made it easier for beneficiaries to advocate for themselves to be free of unwanted imposition of religion when receiving publicly funded services.

212. AA anticipates that the loss of the notice and referral requirements, as well as the elimination of beneficiary protections in indirect federal financial assistance programs, will require an education campaign in response. This education campaign will be important for all beneficiaries, but it will be especially essential for marginalized populations who often have limited opportunities to access information about nondiscrimination rights or to search for alternative providers. AA anticipates that it will need to work closely with local affiliates, providing them with support and resources to provide public education for these hard-to-reach and vulnerable populations.

213. Education campaigns are a typical means by which AA pursues its mission. It conducts its education work in various ways, including through webinars and conferences. For instance, it recently conducted webinars on Winter is Coming: Ensuring Equal Access to Public Forums Around the Holidays (encouraging constituents to bring complaints for church-state violations in government holiday displays) and Graduations and Prayer: Last Chance to Fight Indoctrination in School (encouraging constituents to bring complaints for church-state violations during school graduations). AA also updates its website with information about contemporary church-state issues. And AA conducts billboard campaigns, such as a 2019

campaign in Arizona to inform the public that a specialty license plate fee for an "In God We Trust" plate directed funds to a private anti-LGBTQ group.

214.    AA is planning an education campaign to attempt to make up for the elimination of the notice requirement and to inform the public of their rights. The education campaign would target both beneficiaries of direct federal financial assistance programs and of voucher programs. AA is planning to focus on the impacts to education and homelessness, and will target beneficiaries who would receive services from ED, HHS, and HUD funding streams. AA anticipates that it will need to continue these public education and outreach programs on a periodic basis while the Rule is in force.

215.    AA anticipates that such a campaign will require a substantial allocation of its limited resources in the form of staff time and funding for field outreach, communications, and legal services. For example, AA will need to identify how to reach beneficiaries most at risk; to develop, print, and distribute education materials; to receive, process, and resolve complaints; and to coordinate with local affiliates in these activities. AA anticipates that these activities will reduce staff time and resources available for other mission priorities, including pursuing different types of litigation to ensure the separation of religion and government, field activities to support and grow AA's network of grassroots volunteers and advocates, and communications activities on other issues concerning the separation of religion and government.

216.    AA also anticipates that the 2020 Rule will impede its ability to pursue its mission of assisting complainants and will require a diversion of resources in response.

217.    AA's website includes a form through which to submit a complaint. AA staff perform an initial review of complaints, and AA staff either handle internally those that may be meritorious or refer them to a partner organization such as co-plaintiff FFRF.

218.    American Atheists receives approximately 140 complaints every year, handling about 116 of those directly. Responding to and resolving these complaints requires hundreds of hours of work each year from AA staff.

219.    As part of its complaint program, AA receives complaints from nonreligious beneficiaries of government-funded programs who object because they are denied services by religious service providers or because such providers violate their religious freedom. AA has received complaints regarding faith-based organizations that receive federal funding from ED (through funding to schools), USDA (through funding to the 4H program), HHS (through funding for homelessness programs), and the VA (through funding for substance abuse programs). In response to some such complaints, AA assists the complainant in locating an alternative service provider and/or submitting a complaint with the relevant agency.

220.    In AA's experience, people are more likely to seek assistance in protecting their religious liberty if they are aware of available legal protections. And without this awareness, beneficiaries will be less likely to seek out AA's assistance by filing complaints. For example, beneficiaries may forgo services altogether—and not contact AA—if they are unaware that they have the right to receive services without coercion or from another non-objectionable provider. AA's anticipated education campaign will encourage people who have been subjected to religious discrimination to file complaints with AA.

221.    The notice requirement also provided information that is useful to AA in its investigation of complaints, namely that the faith-based organization receives federal funding and is bound by the associated nondiscrimination protections. This information makes AA's initial investigation of the complaint meaningfully easier by eliminating the need to spend staff time researching whether the organization receives any of many potentially relevant federal

funding streams, or whether it is a subgrantee of any such funding streams. This research can be time intensive, and the delay it creates may cause and has caused complainants to give up on receiving services, suffer additional consequences from the lack of services, or fall out of contact with AA. Identifying organizations receiving passthrough federal funds is especially difficult, because those organizations typically are not readily identifiable through federal grants databases. The loss of the notice requirement will make AA's assistance to complainants more time consuming and difficult.

222.    The now-eliminated alternative provider requirement made it easier for AA to resolve complaints with the service provider. For example, AA was contacted by a student at a public college in Florida. As part of her practical training, her nursing program had placed her with a religious medical care facility. As a result, not only was she required to engage in various religious activities with patients and staff, but also, more importantly, her primary networking opportunity was at a religious institution that could refuse to hire her on religious grounds. Because of the notice and referral requirement in the 2016 Rule for ED, AA was able to assist her through the relatively simple process of seeking an alternative placement through her school. Without that regulation, it would have fallen to the student and AA to identify alternative medical facilities in the region, verify that the facilities had no religious affiliation, and ensure that the facility was willing and able to accept the student as part of her practical training. Eliminating the referral requirement will make it less likely that a recipient would obtain a referral from the faith-based organization, and will therefore require additional effort by organizations like AA to identify an appropriate referral. It will also make it more difficult for AA to resolve complaints by working with service providers.

223.    AA also anticipates that, as a result of the 2020 Rule, it may have to devote additional staff time to assisting its clients to find an appropriate secular option, such as the example discussed above or alternative providers for substance abuse treatment services. Identifying an appropriate referral can be a labor-intensive process for AA's staff, especially in smaller, more rural communities where alternate service providers are likely to have fewer resources, where they are less likely to have a robust online presence, and where AA's pre-existing connections with people on the ground are limited. Connecting a beneficiary with an alternate, equivalent service provider in that situation could require up to eight additional hours of work on the part of law clerks and field staff to identify potential alternatives, and up to four hours of additional attorney time to ensure that the alternative providers are able to meet the beneficiary's needs and connect the best available alternate service provider with the beneficiary.

### G.    *Hindu American Foundation*

224.    HAF's work includes education to promote an accurate understanding of Hinduism, advocacy for policies that, among other things, enhance the wellbeing of Hindus in the United States, and community empowerment work in Hindu American communities. This work includes education campaigns on a range of issues, such as anti-bullying and know-your-rights initiatives that educate Hindu Americans on how to effectively address and deal with bullying in schools and hate crimes. These campaigns involve the creation and distribution of online and print resources, engagement with diverse stakeholders, and hosting seminars and events.

225.    As part of its community empowerment work among the various communities on which it focuses, HAF does substantial work to support community building in Bhutanese Hindu refugee communities throughout the United States. This work includes supporting community connection, such as through town halls and youth retreats, and education, such as through anti-

bullying information. HAF has also provided direct grants to organizations that support Bhutanese Hindu refugee communities.

226.   Bhutanese Hindu refugee communities have great social needs. They have disproportionately high rates of poverty and health needs, including mental health, and low rates of education. Of particular concern, the communities have disproportionately high rates of suicide.

227.   HAF's mission includes supporting these communities in many ways, among these providing support for retaining their traditional cultural heritage, including Hinduism. HAF believes, and studies have found, that loss of cultural heritage in these refugee communities contributes to the prevalence of mental health needs and risk of suicide. Accordingly, HAF's educational work and its grant programs aim to counter the harmful loss of cultural heritage.

228.   Bhutanese Hindu refugees receive many federally funded social services. In many regions in which refugees settled, such as Texas, Minnesota, and throughout the Midwest, faith-based providers are a dominant provider of these social services. The services they provide, such as refugee support, English language training, citizenship-test preparation, skills training, and food and housing support, are essential. Federal financial assistance, in particular from HHS (via various programs of the Office of Refugee Resettlement) and DHS (via the Citizenship and Assimilation Grant Program of U.S. Citizenship and Immigration Services), funds many of these types of services.

229.   Unfortunately, the way that some faith-based organizations provide services can contribute to the erosion of the Bhutanese community's cultural heritage, in particular its Hindu identity. HAF has heard reports of direct proselytizing by faith-based service providers while providing federally funded social services. HAF is also aware of faith-based providers that invite

recipients of services to attend religious programming separate from the direct provision of federally funded social services. For example, they might offer a Bollywood movie night, which is preceded by Bible study.

230.    Problematically, however, members of the Bhutanese refugee community often are not aware that participating in such religious programming is not necessary to continue to receive services, and often believe that attendance is required or that it would be impolite not to participate. This lack of knowledge of their rights is compounded by the significant language and education barriers that the population faces.

231.    Accordingly, explicit notice that federally funded social services may not be withheld based on the recipient's nonparticipation in religious programming and that referrals are available is essential to support members of these communities in maintaining their sense of cultural and religious identity. Without this notice, such individuals often feel compelled to participate in unwanted religious programming because they believe that doing so is necessary to continue receiving services from a faith-based provider.

232.    Accordingly, HAF has determined that it must undertake an education campaign to respond to the 2020 Rule's elimination of the notice and referral protections. This campaign will likely include a generalized information campaign for Hindus in the United States, as well as one targeted at the Bhutanese Hindu refugee population and other discrete populations particularly in need of such information. HAF anticipates that this campaign will be ongoing while the 2020 Rule is in place, because regular reminders of rights will be necessary to empower people to be able to protect their own religious identity.

233.    This educational campaign will require diversion of HAF's limited staff time and resources. Its staff would have to devote time to putting the information together, making it

culturally accessible and translated in appropriate languages, and distributing it. The distribution will likely occur through both online and hard-copy paper notices in the refugee communities, which HAF has determined is the most effective way to reach these communities. HAF will have to use its limited financial resources to pay for the distribution, possibly through stipends to its partner organizations.

## CLAIM FOR RELIEF

### Count One – The 2020 Rule is Arbitrary and Capricious in Violation of the Administrative Procedure Act (5 U.S.C. § 706)

234.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

235.    The 2020 Rule's changes to the 2016 Rule are arbitrary and capricious.

236.    The 2020 Rule is not a product of reasoned decisionmaking. The Agencies failed to articulate a "rational connection between the facts found and the choice made," "entirely failed to consider an important aspect of the problem" including alternatives to eliminating the notice and referral rights, and "offered an explanation for [their] decision that runs counter to the evidence before [them]" and that "is so implausible that [the decision] could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43 (quotation omitted); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). It is therefore arbitrary and capricious.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.  Declare that the 2020 Rule violates the APA;

2.  Set aside and vacate the regulations amended by the Defendant Agencies in the 2020 Rule: HHS's amendments to 45 C.F.R. Parts 87 and 1050; USDA's amendments to 7

C.F.R. Part 16; HUD's amendments to 24 C.F.R. Parts 5, 92, and 578; VA's

amendments to 38 C.F.R. Parts 50, 61, and 62; ED's amendments to 2 C.F.R. Part

3474 and 34 C.F.R. Parts 75 and 76; DHS's amendments to 6 C.F.R. Part 19; DOJ's

amendments to 28 C.F.R. Part 38; and DOL's amendments to 29 C.F.R. Part 2.

3.  Award Plaintiffs costs, attorneys' fees, and other disbursements for this action under

the Equal Access to Justice Act, 28 U.S.C. § 2412; and

4.  Grant any other relief this Court deems appropriate.

Dated: January 19, 2021                              Respectfully submitted,

_/s/ Jeffrey B. Dubner_                              Jennifer C. Pizer (N.Y. Bar No. 2334068)**
Robin Thurston (D.C. Bar No. 1531399)*              Lambda Legal Defense and Education Fund
Kristen Miller (D.C. Bar No. 229627)*              4221 Wilshire Blvd., Suite 280
Sean Lev (D.C. Bar No. 449936)*                    Los Angeles, CA 90010-3512
Jeffrey B. Dubner (N.Y. Bar No. 4974341)           (213) 590-5903, jpizer@lambdalegal.org
Democracy Forward Foundation
P.O. Box 34553                                     Camilla B. Taylor (N.Y. Bar No. 2802635)
Washington, DC 20043                               Lambda Legal Defense and Education Fund
Phone/fax: (202) 701-1782                          65 E. Wacker Place, Suite 2000
rthurston@democracyforward.org*                    Chicago, IL 60601-7245
kmiller@democracyforward.org*                      (312) 663-4413, ctaylor@lambdalegal.org
slev@democracyforward.org*
jdubner@democracyforwrd.org                         Karen L. Loewy (N.Y. Bar No. 5145883)
                                                   Lambda Legal Defense and Education Fund
                                                   1776 K Street NW, 8th Floor
Richard B. Katskee (D.C. Bar. No. 474250)*         Washington, DC 20006-2304
Alex J. Luchenitser (D.C. Bar No. 473393)*         (202) 804-6245, kloewy@lambdalegal.org
Alexander C. Gouzoules (N.Y. Bar No.
5339601)                                           M. Currey Cook (N.Y. Bar No. 4612834)**
Americans United for Separation of Church and      Lambda Legal Defense and Education Fund
State                                              120 Wall Street, 19th Floor
1310 L St. NW, Suite 200                            New York, New York 10005-3919
Washington, DC 20005                               (212) 809-8585,
Phone: (202) 466-3234/fax: (202) 466-3353          ccook@lambdalegal.org
katskee@au.org
luchenitser@au.org                                 *Pro hac vice motions to follow
gouzoules@au.org                                   **Applications for admission to this Court to
                                                   follow

Counsel for Plaintiffs